Kirschman, Appellant, *v.* Pitt Publishing
Company.

Argued March 29, 1935.   Before FRAZER, C. J., SIMP-
SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Harold E. McCamey,* of *Dickie, Robinson & McCamey,* with him *Charles A. Woods, Jr.,* for appellant.

*Wm. S. Moorhead,* of *Moorhead & Knox,* with him *M. H. Ewing,* for appellee.

OPINION BY MR. JUSTICE MAXEY, May 13, 1935:

The appellant, who was the plaintiff below, filed suit against the appellee in an action in trespass for malicious prosecution and false arrest. He claimed that the defendant, Pitt Publishing Company, falsely charged that he "armed with a revolver did unlawfully on a public highway attack and rob affiant [an employee of defendant] of valuable papers of the value of $10." Upon this charge he was arrested, restrained of his liberty, and required to furnish bond for hearing, later being discharged by the justice of the peace. After trial the jury returned a verdict for the plaintiff in the sum of $25,250. Rules by defendant were entered for judgment n. o. v. and for a new trial. The rule for judgment n. o. v. was made absolute on the ground that the proof did not show that the individual who had the plaintiff arrested was authorized so to do by the defendant company.

This is the background of this case: In 1926, the plaintiff bought a regular newspaper route of the Sun-Telegraph. Sometime later the defendant became the publisher of this newspaper, and a controversy arose among the distributors, the result of which was that the circulation manager orally agreed that the dealers would be guaranteed the right to distribute this paper on their routes if they would cease delivering the Press. The plaintiff complied with this condition. He claims that sometime prior to the present controversy the defendant had been trying to take over his route and had been endeavoring to ascertain who his customers were. The plaintiff then talked to the circulation manager, stating that he would be willing to sell his route. The latter replied: "This is a big company. We don't buy anything

like that; we will just go and take it." On July 28, 1930, a number of defendant's employees followed plaintiff's newsboys. Later plaintiff was informed that one of defendant's employees, Conner, was following another of his newsboys on his route, taking down customers' names. Plaintiff caught up with Connor, asked him to hand over the slips in his hand containing these names and to stop following the boys. A few days later plaintiff was arrested on the charge of "highway robbery and carrying firearms." Subsequently it was more specifically charged that he robbed affiant of valuable papers of the value of $10. He gave a bond for a hearing, and was later discharged.

The question here is: Was there sufficient evidence to go to the jury, which, if credited, would constitute legal support of the finding that Connor in making a criminal information against Kirschman was acting on the authority of the defendant? Plaintiff attempted to tie the Pitt Publishing Company (defendant) to his arrest, by the testimony of three witnesses, including himself. First, he testified that he asked Connor why the latter had had him arrested and Connor replied: "I didn't want to do it, but if I didn't do it, the Sun-Telegraph would have fired me." This testimony is incompetent to prove Connor's authority to make the information. At most, it expresses only Connor's opinion of what would have happened to him if he had not taken this action against Kirschman. This opinion must have been based upon either a conjecture or on what *somebody* connected with the "Sun-Telegraph" had told him. Who this somebody was does not appear, and if it did it would have to be followed by proof that this person had authority to act for the Pitt Publishing Company on a matter of this kind. This testimony is too imponderable to count for anything in the legal scales which determine whether plaintiff came forward with the proof required. Plaintiff also called in rebuttal an officer named Zygello, who testified that he was near a group of Sun-Telegraph men

who had congregated about five o'clock in the afternoon of July 28, 1930. A man whom he described as "one of the bosses" "went in," the witness said, "and telephoned to the Sun-Telegraph and when he came out he said, 'Connor, if you don't make an information against him, you will be fired.'" All the witness knew as to the identity of this man was that "he represented himself to be one of the bosses." Zygello's testimony obviously possesses no probative value on the pivotal issue.

Plaintiff particularly relies upon the testimony of Miss Helen Kirschman, his daughter, who testified that subsequent to the arrest of her father she was called on the telephone from the Sun-Telegraph office by Mr. Bloom, who was the circulation manager for the paper at that time. She was asked: "What did he say to you with respect to that matter that your father had at Alderman Verona's office? A. He said the suit that was started, he knows it wouldn't be heard and my Dad didn't have to appear at Verona's office. Q. Did he tell you what the suit was for that he was talking about? A. Highway robbery. Q. Did he say it was the suit that the Sun-Telegraph had started? A. Yes, he did." This last question was highly improper and if objected to it would undoubtedly have been excluded. But even this question and answer unobjected to do not constitute evidence of sufficient weight to carry the case to the jury. The question was obviously "a catch question." It assumed a fact not in evidence, to wit, that this suit had been started by the Sun-Telegraph. No such fact had been established, even assuming that the "Sun-Telegraph" and the Pitt Publishing Company are synonymous (an assumption to which the plaintiff with the burden resting upon him is not entitled). No court with due regard for justice would ever permit such an improper question, with its answer, to be used as the sole or chief support of the heavy burden resting upon plaintiff in an action of this kind. Questions of this character have always met with the condemnation of judicial tribunals. Joseph Chitty in his Prac-

tice of the Law (2d ed.), volume III, page 901, says: "It is an established rule, as regards cross-examination [and, of course, it is an even stronger rule in direct examination, as here], that a counsel has no right, even in order to detect or catch a witness in a falsity, falsely to assume or pretend that the witness had previously sworn or stated differently to the fact, *or that a matter had previously been proved when it had not* [italics supplied]. Indeed, if such attempts were tolerated, the English Bar would soon be debased below the most inferior of society." In Hardy's Trial, 24 How. St. Tr. 754, Mr. Erskine was cross-examining a witness to the proceedings of an alleged seditious meeting, and asked: "Then you were never at any of those meetings but in the character of a spy?"—"As you call it so, I will take it so." This method of questioning was then and there condemned by Lord Chief Justice EYRE. A case in which a question closely paralleling in attempted adroitness the question in the case at bar occurred in the Parnell Commission's Proceedings, 19th day, Times' Rep. pt. 5, page 221. The "London Times" had charged the Irish Land League with complicity in crime and outrage. A constable testifying to outrages was cross-examined by the opponents as to his partisan employment by the "Times" in procuring its evidence. The question asked him was as follows: "How long have you been engaged in getting up the case for the 'Times'?" The following colloquy then took place: Sir H. JAMES: "What I object to is that Mr. Lockwood, without having any foundation for it, should ask the witness 'How long have you been engaged in getting up the case for "The Times"?'" Mr. Lockwood—"I will not argue with my learned friend as to the exact form of the question, but I submit that it is perfectly proper and regular. If the man has not been engaged in getting the case for 'The Times' he can say so." Sir H. JAMES: "I submit that my learned friend has no right to put this question without foundation. Counsel has no right to say 'When did you murder A. B.?' unless there is some

foundation for the question. In this same way he has no right to ask 'How long have you been engaged in getting up this case?' for it assumes the fact." . . . President HANNEN: "I do not consider that Mr. Lockwood was entitled to put the question in that form and to assume that the witness has been employed by 'The Times.' "

Wigmore on Evidence, volume II (2d ed.), section 780, says: "A question which *assumes a fact* that may be in controversy is leading, when put on direct examination, because it affords the willing witness a suggestion of a fact which he might otherwise not have stated to the same effect. Conversely, such a question may become improper *on cross-examination,* because it may by implication put into the mouth of an unwilling witness, a statement which he never intended to make, and thus incorrectly attribute to him testimony which is not his."

When the witness was asked the question: "Did he say it was the suit that the Sun-Telegraph had started?," she was really asked merely to *identify the suit* that Mr. Bloom, the circulation manager, had discussed with her in the telephone conversation, *the sole purpose of which* conversation was to notify her that her father did not have to appear at the alderman's office. This question and answer *cannot fairly be interpreted* by anyone as meaning that he (Bloom) had positively informed her that the Sun-Telegraph had started the criminal proceedings against Kirschman. Even if it were given this interpretation, we would still have the question as to what authority Bloom, the circulation manager, had to bind the Pitt Publishing Company in a matter of this kind. However, we do not reach this point in the case because the question itself is open to condemnation and even though it stands in the record unobjected to, no court with due regard for the proprieties of judicial procedure and the just end such procedure serves would permit such a "catch" question with its answer to constitute the chief or sole support of a verdict. The *apparent* purpose of this question as opposed to its *hidden* purpose was to

identify the suit that Bloom was talking about. This is plain from the preceding question which was: "Did he [Bloom] tell you what the suit was for that he was talking about? A. Highway robbery." Then followed the objectionable question already discussed. We will permit this "catch" question to have no more weight in this case than it would have if it had not masked a hidden import. Its *prima facie* import was identification of the suit referred to in the telephone conversation as the suit started by a Sun-Telegraph employee; its *concealed* import was to fix responsibility on the Sun-Telegraph (meaning thereby the Pitt Publishing Co.). Advocates cannot ask questions containing *cryptic* meanings, elicit answers based upon the question's *apparent* meaning and then expect courts to adopt the cryptic meaning as the question's exclusive import. Suits are not justly won that way.

There is no evidence to show that Connor was authorized by the defendant to prosecute Kirschman. There is no evidence to show that such authority could be legitimately inferred from the nature and scope of his employment. It is not necessary to discuss the question of whether or not Bloom was authorized by the defendant to initiate this suit or that such authority could be fairly inferred from the nature and scope of his employment, for Bloom is not on this record sufficiently identified with this suit to bring forward that question. The law as to the liability of a principal for the acts of his alleged agent in instituting a malicious prosecution is set forth in Markley v. Snow, 207 Pa. 447, 56 A. 990. We there held that "the act of the agent becomes that of the principal only when expressly authorized or when his authority to act may fairly be inferred from the nature and scope of the employment." This question has more recently been discussed in Farneth v. Commercial Credit Co., 313 Pa. 433, 169 A. 89; Bowman v. Press Publishing Co., 316 Pa. 531, 175 A. 483, and Edwards v. Power Gasoline Co., 109 Pa. Superior Ct. 253, 167 A. 487.

The court below did not err in deciding that the conclusion that the Pitt Publishing Co. was responsible for the criminal prosecution of Kirschman, was not legally permissible from the evidence plaintiff produced.

The judgment is affirmed.