**Carroll E. WOLFORD**

v.

**GENERAL CABLE COMPANY.**

**Civ. A. No. 70–1148.**

United States District Court,
E. D. Pennsylvania.

Feb. 26, 1973.

Herbert Monheit, Philadelphia, Pa., for plaintiff.

F. Hastings Griffin, Jr., Philadelphia, Pa., for defendant.

## OPINION

BECHTLE, District Judge.

The aircraft carrier, U.S.S. *Saratoga*, was in dry dock in the Naval Shipyard in Philadelphia on June 21, 1968, undergoing a major overhaul. Plaintiff, employed as an electrician by the Federal Government, was injured that day when he was caused to lose his balance and fall on his back while assisting the pulling in of an electric conducting cable through a wireway on the 03 deck of the carrier. The cable has been identified as being type MSCA 44 [1] manufactured by the General Cable Company in 1965 at its Elkton plant in Maryland. Plaintiff brought this diversity action against the manufacturer based on strict liability and negligence. His present theory of liability is that the cable was unreasonably dangerous because it was not flexible enough for the purpose of installation, and that fact was the cause of his injury. The matter is before me on defendant's motion for summary judgment based on the claim that plaintiff cannot demonstrate anything wrong with the cable for which defendant may be held responsible.

█ Defendant prefaces his argument with a comparison of plaintiff's answers to interrogatories with those of his supplemental ones. This is done to show that apparently there has been a change in plaintiff's theory of recovery. Such a comparison is for the jury's consideration and not for the Court on a motion for summary judgment.

In answer filed September 3, 1971, to defendant's supplemental interrogatory No. 45, asking plaintiff to, "State in detail what defect or defects were present in the armor cable on which plaintiff was pulling at the time the accident took place," plaintiff stated: "This matter is still under investigation. Cable was defective in that it did loop and twist during its installation on the ship. The armor sheath was too tightly placed over the outer insulation." On August 22, 1972, defendant took the deposition of Dimitry B. Sergay, a mechanical engineer and consultant, whom plaintiff intends to call as an expert witness at the trial, if there is one. Sergay, after examining a piece of the cable, stated that something was wrong with the viscosity of the valley filler around the copper wires in the cable. This, he said, caused stiffness in the cable which, when unraveled from the spool or reel, caused it to have a tendency for retaining the curvature it had when stored on the spool. In response to the most recent set of supplemental interrogatories, plaintiff stated on August 28, 1972, that it was the "valley filler mixture" of the cable that was defective; that it was excessively stiff and brittle and this state of the mixture "caused the cable to become highly inflexible. This high degree of inflexibility caused the cable, which was being pulled by Wolford, to resist being straightened out by the tension being applied and the cable suddenly looped. At that moment, the cable stopped moving, causing Wolford to lose his balance, fall and sustain injury." He also added that the source of this information was based in part upon the knowledge and expertise of Sergay.

Unless defendant is successful on this motion, plaintiff advises that he will attempt to show that defendant did not manufacture the cable in strict adherence to military specifications. He contends that, if the cable had been manufactured according to the specifications, the "valley filler" of the cable would have been "putty-like" and it would have been more "flexible."

Defendant also took the depositions on August 22, 1972, of Clyde Hatch, head of the Cable and Wire Section of Naval Ship Engineering, and Theodore Acosta,

1. The letters "MSCA" stand for "Multiple-conductor, Shipboard, Communication-and-Control, Armored" cable; the number 44 indicates that forty-four conductors of copper wire are contained in the cable.

his assistant. They testified that there is no requirement that MSCA 44 cable have a certain degree of flexibility, and there is no connection between the purpose of the filler in the cable and the flexibility of this cable. Taking the testimony as its starting point, defendant maintains that plaintiff cannot show that it violated the military specifications; and even if it did, the paragraphs violated have no bearing on flexibility of the cable.

Type MSCA 44 cable was required to be manufactured in strict accordance with Military Specifications MIL–C–2194D(NAVY) (15 April, 1959) or MIL–C–915B(NAVY) (23 April, 1965).[2] According to the information on page 54 of the Bureau of Ships Cable Comparison Guide of 1964 concerning *Data Pertaining to Electric Shipboard Cable*, cable type MSCA 44 was to be of watertight construction and for "non-flexing service" to be used in "fixed wireways" on the vessel for communications and control purposes. From this information and the deposition of Hatch and Acosta, defendant argues that, "There is no provision in the applicable military specifications which prescribes a certain degree of flexibility for MSCA 44 cable nor do the specifications contain standards or tests which measure cable flexibility, nor was flexibility a concern of the Government when it drafted the specifications for the cable." (Defendant's Motion for Summary Judgment, paragraph 8).

The words "non-flexing service" and "fixed wireways" are terms describing the general class of use to which the cables will be put and do not limit the type of tests such cables must meet. For in-

stallation purposes, the cable in question must have some flexibility. The Cable Comparison Guide itself provides that MSCA 44 have a minimum bending radius of no less than seven inches. Moreover, paragraph 4.8.9.3.1 of MIL–C–915B, entitled *Cables for Non-Flexing Service*, provides: "Cables for non-flexing service . . . shall be bent 180 degrees over a mandrel having a diameter as indicated in the detail requirements." According to the *Standard for Armored Cable*,[3] regarding flexibility of cables, "The flexibility of armored cable of other than the lead-covered type shall be such that the finished product can be bent around a mandrel having a diameter [of 9.07 inches, i. e., 8 x 1.134 inches], without injury to the conductor assembly and without the armor opening up at any point sufficiently to expose the cable." Also, § 18.31(c) of Recommended Practice for Electric Installations on Shipboard (1962 Rev.), published by American Institute of Electrical Engineers, states:

"(c) *Bending Test*—A ten foot sample of finished cable should be capable of being bent at room temperature 180 degrees around a mandrel having a diameter as given in table 19 [Appendix]." [4]

In addition, paragraph 4.8.14, et seq., of MIL–C–915B requires the manufacturer to put two 30-inch sections of completed cable through a bending endurance test (one at 75° C. and the other at 30° C.) to determine after how many bends at a 90-degree angle in each direction the copper wire conductors will break.

Hatch, defendant's expert, stated at his deposition that one of the initial

---

2. These specifications are mandatory for use by the Department of Defense in the procurement of supplies covered by the specifications. See 32 C.F.R. § 1.1201 (a) (1 & 2).

3. Standards issued February 5, 1959, by Underwriters' Laboratories, Inc., 207 East Ohio Street, Chicago, Ill.

4. These standards have been adopted by the Coast Guard, Department of Transportation. See 46 C.F.R. (1972) § 110.10–1(d) (1).

qualities of the filler material is that it be "putty-like." (Hatch Deposition, p. 20.) In support of his argument that the specifications themselves require that the filler material retain this quality through the normal service life of the cable, plaintiff relies on paragraph 3.12.11.2.4 of Specifications MIL-C-2914D(NAVY).

This paragraph provides:

> *Filler Impregnation.*—The moisture and flame-retardant impregnating compound shall consist of high grade insulating ingredients which retain their initial qualities during the normal service life of the cable. . . . Except in flexible cables, the filler shall be compacted and thoroughly impregnated in such a manner as to completely fill all interstices of the core and make the filler one homogenous structure. . ."

Defendant meets this argument on two grounds: First, it claims that the paragraph applies only to the moisture and flame-retardant qualities of the impregnating compound when used. Second, even if it is wrong on the first ground, the paragraph does not apply to MSCA 44 made by it in 1965. By affidavit, Hatch stated: "Two materials which may be used in conjunction with the filler under paragraph 3.12.11 of MIL-C-915B, are core-sealing compounds and fibrous materials (such as, asbestos or glass fibers)." David A. Silver, Director of Engineering at defendant's plants, swears that the defendant did not use any fibrous filler materials or impregnating compounds in the cable in question, but used core-sealing compounds. It points out that it was permitted to do this either by the specific provisions of paragraph 3.12.11.2.1 of MIL-C-915B,[5] or by special permission to use a substance known as "Solar KM-700" as a valley sealer in place of asbestos or glass fiber.[6]

■■ However, plaintiff is prepared to offer testimony by Professor William G. Wolfgang, Director of Textile and Fiber Research at the Philadelphia College of Textiles and Science, that the "valley filler" of the cable in question contained asbestos fibers and small amounts of glass fibers. From this testimony, he will argue that if fibrous filler were used in the cable that substance should have retained its "putty-like" quality and the cable would have been more flexible. Thus, quite obviously, there appears to be an issue of material fact in this case.

Moreover, although compliance with an administrative regulation relieves the actor of negligence *per se,* it does not establish as a matter of law that he exercised due care. Berkebile v. Brantly Helicopter Corp., 219 Pa.Super. 479, 281 A.2d 707, 710 (1971). There the Superior Court of Pennsylvania said: "Compliance with the statute or regulation is admissible as evidence of the actor's exercise of due care, but such compliance 'does not prevent a finding of negligence where a reasonable man would take additional precautions.' Restatement (Second) of Torts § 288C (1965)."

■ Defendant objects to Sergay testifying as an expert at the trial. It claims that he is unqualified, because he has no experience with the manufacture, examination or inspection of shipboard cable, or familiarity with the applicable military specifications on the product. Clearly, the physical and chemical properties and behavior of cable like that in question are subjects

---

5. The paragraph, in part, provides: "Asbestos or glass fibers, pre-impregnated with suitable moisture and flame-retardant insulating compounds, shall be used in conjunction with the approved watertight core sealing compounds as fillers for heat and flame-resistant cables

(See 1.21.1). *Fibrous fillers may be omitted at the manufacturer's option* . . ." (Italics supplied.)

6. See paragraph 3.1 of General Cable Corporation's Design Specifications, DS-550 (Rev'd 2-3-64).

about which experts may testify. A witness need not have had practical experience in a given industry in order to qualify as an expert in litigation involving a product manufactured by a party. Trowbridge v. Abrasive Co. of Philadelphia, 190 F.2d 825 (CA3, 1951). *Also see,* Sitta v. American Wire and Steel, 254 F.2d 12, 16 (CA6, 1958); Dazenko v. James Hunter Machine Co., 393 F.2d 287, 290 (CA7, 1968). I have read the list of credentials given by Sergay in his deposition, which at this time I must consider as not in dispute. I think he is qualified to testify as an expert witness on the properties of the cable.

Defendant's motion for summary judgment will be denied.