642 A.2d 529

**Charles DiFRANCESCO and Anna M. DiFrancesco**

v.

**EXCAM, INC., Joffe's Gun Shop, Inc. and RSR Wholesale Guns, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued Feb. 8, 1994.

Filed May 10, 1994.

174

Michael J. Cawley, Philadelphia, for appellants.

Alexander A. DiSanti, Media, for appellees.

Before KELLY, POPOVICH and HESTER, JJ.

HESTER, Judge:

Excam, Inc., Joffee's Gun Shop, Inc., and RSR Wholesale Guns, Inc., appeal following a jury award of $125,000.00 in favor of appellees. Appellants were held responsible for the injuries sustained by Charles DiFrancesco after the Excam TA38S derringer hand pistol he was carrying in a sweater pocket accidentally discharged. The jury held appellants liable on a theory that the pistol was defectively designed and manufactured. Appellants maintain that they were entitled to a judgment notwithstanding the verdict or a new trial. Their arguments lack merit, and we affirm.

In this appeal from a jury verdict in a firearms products liability case, the following facts are pertinent. On December 6, 1987, Charles DiFrancesco, ("appellee"), purchased an Excam TA38S derringer pistol from Joffee's Gun Shop. The derringer was manufactured by Excam and distributed to Joffee's by RSR.

On November 15, 1988, at approximately 4:00 p.m., appellee, who was working in his son's bar, was carrying the derringer pistol in the right-hand pocket of his sweater vest. When appellee bent over the ice machine, he inadvertently struck the hammer spur of the loaded derringer pistol on a box causing the pistol to discharge. As a result, appellee suffered a gun shot wound which penetrated his right abdomen and exited his posterior right flank. He required extensive emergency surgery and further follow-up surgery.

On August 13, 1990, appellee and his wife, Anna, instituted this action against appellants based upon a theory of strict liability. They contend that two different aspects of the

design of the Excam model TA38S derringer made the product unreasonably dangerous, unsafe, and defective. First, they maintained that the design of the gun posed an unreasonable danger due to the fact that a blow to the exposed hammer when resting against the breach, or down position, could cause an accidental discharge. Second, appellees maintained that in addition to the three hammer positions identified in the instruction manual, there was, in fact, a fourth or "pseudo half-cocked position." Appellees argued that this fourth position constituted a defect since pressure on the thumb safety would cause the hammer to drop into the down position.

At trial, appellee testified that he placed the gun in the third or half-cocked position as described in the instruction manual. Appellee understood this to mean that the safety was in place. He called several expert witnesses who supported his theory regarding the existence of the fourth hammer position. Appellants likewise called upon experts to defend the design of the derringer. Based upon the evidence presented at trial, the jury concluded that the pocket pistol was defective in design and manufacture.

Appellants filed post-verdict motions arguing that prejudicial error and appellees' inability to establish the defective design of the derringer entitled them to judgment notwithstanding the verdict or a new trial. The court denied the motions. This appeal followed.

First, appellants argue that they are entitled to judgment notwithstanding the verdict since appellees did not provide evidence of an alternative feasible design and therefore, did not establish the defective nature of the derringer's design. Our standard of review of an order denying judgment notwithstanding the verdict is whether

> there was sufficient competent evidence to sustain the verdict. *Wenrick v. Schloemann–Siemag Aktiengesellschaft, et al.*, 523 Pa. 1, 4, 564 A.2d 1244, 1246 (1989). The standard of review for an appellate court is the same as that for a trial court: j.n.o.v. will be entered only in a clear case where the facts are such that no two reasonable minds could fail to

agree that the verdict was improper. *Pirozzi v. Penske-Olds-Cadillac-GMC,* 413 Pa.Super. 308, 312, 605 A.2d 373, *appeal denied,* 532 Pa. 665, 616 A.2d 985 (1992). An appellate court will reverse a trial court ruling only if it finds there was not sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every favorable inference reasonably drawn from the evidence. *McDevitt v. Terminal Warehouse Co.,* 304 Pa.Super. 438, 450 A.2d 991, 993 (1982).

*Armstrong v. Paoli Memorial Hospital,* 430 Pa.Super. 36, 42, 633 A.2d 605, 608 (1993).

▮▮▮ Pennsylvania law requires a plaintiff to prove two elements in a products liability action: first, that the product was defective, and second, that the defect in the product was a substantial factor in causing the injury. *Berkebile v. Brantley,* 462 Pa. 83, 337 A.2d 893 (1975). In determining whether or not a product is defective, the design and operation of the product must be considered, including whether the product was equipped with the proper safety devices which would allow the user to avoid danger when using the product. *Id.* We have held that in a defective design case, the question is whether the product should have been designed more safely. *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408 (1984).

▮▮▮ Instantly, appellants argue that they are entitled to judgment notwithstanding the verdict because appellees offered no evidence of an alternative, feasible design which would support the jury's conclusion that the Excam .38 caliber derringer was defective.[1] Appellants suggest that current Pennsylvania law requires a plaintiff to produce relative costs of the design considerations as well as any new dangers created and any reduction in the benefit of the newer, safer

1. We note that the jury determined that the derringer was defective in both design and manufacture. Appellants make no argument with regard to the jury's finding that the derringer was defective in the manufacture.

design.[2] In essence, appellants suggest that case law requires
a plaintiff to provide specifications and plans for safer designs
as well as risk/effectiveness ratios. Pennsylvania courts have
not imposed such rigorous restrictions in strict liability cases.
To the extent that other courts have evaluated similar issues,
they have held that evidence regarding design defects is
subject to a risk-benefit analysis when determining whether a
product is unreasonably dangerous pursuant to Restatement
(Second) Torts § 402A.[3] *Barker v. Lull Engineering Co.*, 20
Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978); *Voss v.
Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450
N.E.2d 204 (1983). There is no similar requirement in Penn-
sylvania.

Further, our review of the record reveals that testimony
was offered based upon registered patents for designs which
would eliminate the potential for the specific way in which
appellee's gun discharged accidentally. The experts offered
evidence that other hand guns on the market were equipped
with safety features which reduced the risk of accidental
discharge. While admittedly there were no comparables avail-
able with regard to a single-action pistol such as the TA38S
derringer, appellees' expert, Robert S. Krauss, explained this

**2.** Appellants bootstrap a challenge of the qualifications of appellees'
experts to this argument. They argue that neither witness is qualified
to testify regarding alternative designs to the TA38S derringer because
neither man holds a patent in the area nor has experience in the
designs of these derringers. On this basis, they challenge the validity of
the opinions and recommendations of the appellees' experts.

**3.** § 402A Special Liability of Seller of Products for Physical Harm to
User or Consumer.
(1) One who sells any product in a defective condition unreasonably
dangerous to the user or consumer or to his property is subject to
liability for physical harm caused thereby to the ultimate user or
consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product;
and
 (b) it is expected to and does reach the user or consumer without
substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and
sale of his product, and
 (b) the user or consumer has not bought the product from or
entered into any contractual relation with the seller.

was due solely to the fact that the appealability of concealable pocket firearms such as the derringer had waned in recent years. Therefore, most manufacturers had discontinued production, and there were few comparables. However, there were double action derringers on the market which incorporated the safety mechanisms recommended by Mr. Krauss. Whether installation of the recommended safety device would change the operation of the derringer was an issue at trial. Mr. Krauss explained that the "idea is not to have a gun, it's to have what the gun does." Notes of Testimony, ("N.T."), 4/15/92, at 136.

Testimony found to be credible by the jury established that the hammer of the gun could be placed in a false half-cocked position which was not described in the instruction manual. The experts testified that in this position, the hammer of the gun could easily move into the discharge position if bumped. The voluminous evidence presented throughout this ten-day trial which supports the jury's determination that the derringer pistol was defective in both its design and manufacture is aptly summarized and evaluated by the trial court. The pertinent portions follow.

Plaintiff's witnesses, George Fassnacht and Robert Krauss, were qualified as experts and were properly allowed to testify on design alternatives for the TA38S derringer.

. . . .

Whether a witness has been properly qualified to give expert opinion testimony is vested in the discretion of the trial court. *Gottfried v. American Can Co.*, [339 Pa.Super. 403,] 489 A.2d 222 (1985). The standard for qualification of expert witnesses in Pennsylvania is a liberal one. "If a witness has any reasonable pretention to specialized knowledge on the subject under investigation, he may testify, and the weight to be given to his evidence is for the jury." *Id.* [489 A.2d] at 226. Although the witness must demonstrate some special knowledge or skill, there is no requirement that a witness acquire expertise as a result of formal schooling; expertise acquired by experience, is experience nonetheless. *Id.* In addition, a witness need not have had

practical experience in a given industry in order to qualify as an expert on a product manufactured by a party to litigation. *Wolford v. General Cable Co.*, 58 F.R.D. 583 (D.C.Pa.1973).

Plaintiff's expert, George Fassnacht, testified and was extensively cross-examined by Defendants' counsel regarding his credentials. (4/14/92 N.T. at 134–44). He is a forensic firearms consultant with many years of experience using and studying the science of ballistics. He spent three years with the Ordinance Technical Intelligence Service at Aberdeen Proving Ground in Maryland where he was assigned to the Chief of the small arms and aircraft weapons branch. In that capacity he examined, evaluated, and tested various types of small arms and made recommendations about alternatives.

Prior to that experience he spent five years with the Philadelphia Police Department supervising the firearms unit and ballistics laboratory. He was a firearms and ordnance [sic] specialist with the Central Intelligence Agency for three years and spent one year training government personnel in Singapore. He has subsequently been an independent expert for nineteen years.

He is licensed as an expert and consultant by the Bureau of Alcohol, Tobacco and Firearms. He is a member of several professional organizations, including, INFORM, an international forensic medicine and science organization; the American Society for Testing and Materials, where he is on the forensics committee; the National Association of Criminal Defense Lawyers; and a number of other organizations having to do with firearms. He has written technical articles and worked on legal seminars.

This court found Mr. Fassnacht to have more than ample credentials to qualify as an expert in forensic firearms consulting and to give opinions concerning the mechanics and design of the TA 38S derringer, including design alternatives.

In like fashion, Robert S. Krauss testified for Plaintiff as an expert in forensic firearms. His credentials were equally

impressive. In addition to a college degree, he has taken many courses that contribute to his expertise, including, physics, mechanical drawing, engineering, microscopy, criminal justice and gunsmithing. He has studied firearms for approximately thirty-five years, done extensive research on firearms patents, and is a certified firearms instructor. He maintains a firearms library and a research ballistics laboratory where he does testing of firearms. He has consulted in firearms for over twenty years.

He, too, is a member of and/or consultant to several professional organizations, including the American Society for Testing and Materials, where he serves on the Forensics Committee; The International Association for Identification; International Wound Ballistics Association; and American Society of Law Enforcement Trainers.

There can be no question of Mr. Krauss's expertise and qualifications to testify as an expert in forensic firearms, including alternative designs of the derringer at issue in this case.

. . . .

The evidence in the instant case supports the jury's findings that the TA 38S derringer pistol designed and manufactured by Excam was defective in both its design and manufacture.

The derringer was designed to have three positions for the hammer—a discharge position, where the hammer rests against the cartridge; a full-cocked position, where the hammer is retracted in order to fire it; and a half-cocked position lying between the discharge and the full-cocked position with an automatic safety locking the hammer in the half-cocked position. When the hammer is in the discharge position, it is in contact with the firing pin and, according to the instruction manual introduced into evidence as Exhibit p–2, can be discharged if the derringer is dropped or bumped. Both Mr. Fassnacht and Mr. Krauss described the capacity of the TA 38S to fire if its hammer is inadvertently bumped while in the discharge position as a design defect. (4/14/92 N.T. at 186 and 4/15/92 N.T. at 159).

The fact that the derringer was meant to be carried in a pocket instead of a holster virtually assures that the hammer will be inadvertently bumped at one time or another. As Mr. Krauss testified, a gun "should only fire when you intend to fire it, which means pulling the trigger." (4/15/92 N.T. at 160). It was his opinion that any gun that could be discharged by accidentally striking its hammer when in the discharge position is unsafe. (4/15/92 N.T. at 159–60).

The evidence also showed that the TA 38S is defective in manufacturing. It was manufactured to have a fourth position not described in the instruction manual (Exhibit P–2). Witnesses called this position the pseudo or false half-cocked position and described it as located between the discharge and half-cocked position, only "a small fraction of an inch" short of the half-cocked position. (4/15/92 N.T. 146). When the hammer is placed in the false half-cocked position, the safety is not engaged (as it is in the half-cocked position) and can easily be moved to the discharge position if it is bumped. Plaintiff's witnesses, Mr. Fassnacht (4/15/92 N.T. at 202) and Mr. Krauss (4/15/92 N.T. at 91–92), as well and Defendants' witness, J.B. Wood (4/23/92 N.T. at 188–92) acknowledged the false half-cocked position.

Mr. Fassnacht testified that there is no way to tell if the hammer is in the false half-cocked position and that Plaintiff could easily have moved the hammer into that position thinking he had put it in the true half-cocked position. (4/14/92 N.T. at 147–48). The differences in the testimony of Plaintiff's two expert witnesses (Fassnacht and Krauss) and Defendant's expert witness (Wood) come down to an issue of credibility—and the jury clearly found Plaintiff's witnesses to be more credible and so found the derringer was defective in both design and manufacture.

Plaintiff's experts testified at length about feasible and safer design alternatives that would eliminate the problems that made the derringer unsafe for its intended use. Mr. Krauss testified, for example, that there were a number of patents in existence for mechanisms that would make the derringer safer. One was a transfer bar that could prevent

the hammer from impacting on the firing pins if it were inadvertently bumped while in the firing position. This change would not significantly affect the size or configuration of the derringer. (4/15/92 N.T. 125–26). Although he was unaware of any derringer on the market that had the safety mechanism he recommended, he was positive such a mechanism could be incorporated into the derringer design. (4/15/92 N.T. at 131). He also named several derringers made from the early 1960's to the 1980's that did not have an exposed hammer. (4/15/92 N.T. at 136). Although Defendants argued that eliminating the hammer would change the derringer into a double-action instead of a single-action revolver, Mr. Krauss replied, on cross examination, "You must remember that a firearm is, as Oliver Winchester said, 'a machine for projecting bullets.' The idea is not to have a gun, it's to have what a gun does. If you buy an electric drill you don't want to drill, you want a quarter-inch hole in the wall. It is the same thing with a gun. Unless you are a collector, you don't want a gun to look at the gun, you want a gun to do something. To shoot at somebody if they are coming at you or to shoot at a target or to shoot at a bear. So whether it is double action or single action it is not material in that case." (4/15/92 N.T. 136–37).

. . . .

It is true that a seller of a product will not be held strictly liable simply because that product is "inherently dangerous," such as a knife that despite perfection in design can cause injury. It can be argued that a gun is inherently dangerous. On the other hand, a product should be safe for its intended use. The TA 38S was designed to be carried in a pocket, but the evidence shows it was unsafe to do so. Its intended purpose is to fire when the trigger is pulled intentionally not to fire when the hammer is inadvertently bumped. Thus, an inherently dangerous product can also be defective in its design or manufacture making it unsafe for its intended use. A manufacturer should not be able to escape liability just by warning of a dangerous condition

which could reasonably have been avoided by a better design. *Schell v. A.M.F., Inc.*, 567 F.2d 1259 (3d Circ.1977). Trial Court Opinion, 9/13/93, pps. 15–17, and 10–14. Clearly, competent evidence was offered which supports the jury's determination that the pistol was defective in design and manufacture.

In the alternative, appellants argue that they are entitled to a new trial because the admission into evidence of dissimilar gun-discharge accidents, improper jury instruction, and the preclusion into evidence of other lawsuits filed by appellees prejudiced appellants. We reject each of appellants' claims. Our rationale is as follows.

"The decision whether to grant a new trial is within the discretion of the trial court, and the court's decision will be overturned on review only if we determine that the court acted capriciously or palpably abused its discretion." *Houseknecht v. Walters*, 404 Pa.Super. 85, 590 A.2d 20 (1991). "A wide degree of latitude in the determination of whether such evidence should be admitted is vested in the trial court." *Lynch v. McStome & Lincoln Plaza Assoc.*, 378 Pa.Super. 430, 436, 548 A.2d 1276, 1279 (1988).

First, appellants maintain that they are entitled to a new trial because the trial court admitted evidence of dissimilar gun discharges. We have held that evidence concerning other incidents involving the instrumentality that causes a plaintiff's harm may be relevant to a number of issues. It may tend to show that the instrumentality was unsafe, or it may tend to show that the defendant had actual or constructive notice of a condition that could cause harm. This evidence is admissible, however, only when the evidence concerns incidents sufficiently similar to the incident involving the plaintiff which occurred under similar circumstances. *Id.*

In *Lynch*, the plaintiff brought suit against a mall owner and an elevator manufacturer on negligence grounds for injuries she received when the escalator on which she rode stopped abruptly. The plaintiff did not assert a strict liability claim against either defendant. The plaintiff sought to intro-

duce computer printouts, belonging to the escalator manufacturer, that reported incidents of abrupt stopping by various escalators. The trial court excluded the evidence since the reports did not provide sufficient information to allow a jury to consider them probative of the condition of the escalator. Specifically, the printouts did not indicate if the escalators involved were manufactured by the defendant, did not explain the circumstances of or causes for the various reported incidents, and did not indicate that the manufacturer knew of the condition. The court determined that the printouts could not provide the jury with any information from which it could conclude that the manufacturer was on notice that the escalator was malfunctioning or unsafe, thus giving rise to a post-sale duty to warn or correct the problem. Since the reports did not contain information which could have been considered probative of the problem, the court properly concluded that the only possible effect of their introduction would be prejudicial and excluded the evidence.

In the present case, the transcript reveals that the evidence introduced by appellees did not pertain specifically to the Excam TA38S derringer pistol. Appellants mischaracterize our holding in *Lynch* in order to bolster their argument. They maintain that under *Lynch*, evidence of similar firearms is not admissible unless they are manufactured by Excam. Furthermore, they argue that the evidence would be inadmissible to prove that a similar type of accidental discharge would happen with a gun manufactured by a different company.

*Lynch* does not stand for the narrow proposition offered by appellants. We stated that evidence concerning other accidents must be probative of the instrumentality which caused a plaintiff's harm. Instantly, the instrumentality was defined by the court to be a pocket pistol with an exposed hammer and a capacity to accidentally fire when its hammer was bumped while in the discharge position. The judge noted that the line of questioning pursued by appellees during direct examination of their expert, Mr. Fassnacht, explained that the defect asserted by appellees was the capacity of the derringer to fire when its hammer was bumped accidentally while in the dis-

charge position. The court concluded, therefore, that appellants' argument was based upon a distinction without a difference to the extent that it was directed to evidence of accidental discharges of other derringers similar in design to the TA38S model. Specifically, the other models to which the expert testified also had a tendency to discharge if their hammers were bumped while in the discharge position.

However, appellants argued that the TA38S model was equipped with a safety, while the other models were not. The court stated that the existence of the safety mechanism on the TA38S derringer was immaterial to the instant case since the safety on the TA38S engaged only when the gun was placed in the half-cocked position. Instantly, it did not engage since Mr. DiFrancesco testified that he put the gun in the pseudo half-cocked position, believing it to be the half-cocked position described in the instruction manual. The exposed hammer actually was transferred from what he thought to be a safe position to the down position. When in the down or "D" position, the exposed hammer, if bumped, could cause the gun to fire accidentally. The pseudo half-cocked position, which was not explained in the instruction manual, was not subject to the safety mechanism on the TA38S derringer, and therefore, the presence of the safety mechanism was not an issue.

Appellants argued that the distinction was important since the issue concerned how to design a safety mechanism that would prevent the TA38S from firing accidentally. They emphasized that the normal carrying position for the gun was not the "D" position but the half-cocked position as explained in the instruction manual. The judge overruled appellants' objection and referred to their position as a distinction without a difference. We agree.

While all parties have clouded the issues quite effectively, the thrust of the case presented to the jury was to decide whether the derringer was defective in the manufacture since the instruction manual did not explain the pseudo half-cocked position; or whether the manufacture of the gun or its design was defective because there was a possible fourth position

which was neither described in the instruction manual nor protected by a safety mechanism.

The testimony of appellees' witness, Mr. Fassnacht, was elicited to show that exposed hammer, single-action firearms, similar to the TA38S model at issue, are defectively designed in that there is no adequate safety on the market which prevents the hammer from striking the firing pins. He added that the weapon is also defective in the manufacture because the safety does not function to prevent the gun from discharging accidentally. He testified further that the manual was defective because it did not alert the user to the possibilities of accidental firing in the pseudo half-cocked position. He opined that the gun should be manufactured so that the hammer could not be placed in a pseudo half-cocked position, or the instruction manual should have warned against the possibility.

Appellants rely upon *Whitman v. Riddell*, 324 Pa.Super. 177, 471 A.2d 521 (1984), for the proposition that evidence involving only an Excam manufactured model derringer TA38S would be substantially similar, probative, and therefore, admissible. They argue that as evidence becomes more dissimilar, the potential confusion created could prejudice a jury's decision. To the extent that variables cause confusion and prejudice, we agree with appellants' argument. However, as appellants have misstated the law created by *Whitman*, we reject their reliance upon that case for the proposition stated. In fact, in *Whitman* we specifically stated that variables which contribute to a potential accident must be considered carefully before a party may draw a corollary. In *Whitman*, the case centered around a dangerous intersection where an overhead traffic signal turned green in two directions at one time. Evidence of other accidents at the intersection was offered to show that the city should have been aware of the dangerous nature of the intersection and that the lack of maintenance of the malfunctioning traffic signal could foreseeably result in accidents. We stated that evidence of other accidents at the intersection would be allowed only if they occurred under the same or similar circumstances, and various factors such as

road conditions were considered. We determined that other accidents occurring at the same intersection from different causes did not constitute similar accidents under the same or similar conditions. In this scenario, it is obvious that our pivotal concern focused on the circumstances surrounding the accident. The similarity of the circumstances determined whether the evidence was admissible.

Instantly, appellants do not argue that the circumstances of the accident hold any importance with regard to the introduction of comparative evidence. They argue only that appellees should have been limited to introducing evidence pertaining specifically to Excam model TA38S derringers that accidentally discharged. They maintain that evidence from similar model derringers which accidentally discharge when their exposed hammer is inadvertently bumped is not substantially similar so as to avoid prejudice. We disagree. The court consistently ruled that other incidents involving accidental discharges of weapons possessing the identical design features of the TA38S derringer were admissible into evidence since the critical nature of the defect, at issue, is the capacity of the TA38S to fire accidentally after a collision with another object, as opposed to a user intentionally pulling the trigger. We conclude that the record reflects the trial court's thoughtful consideration of the issues and the impact of the evidence admitted. Likewise, we find no evidence of a capricious abuse of discretion.

Next, appellants maintain that they are entitled to a new trial due to an improper jury instruction. On the theory of proximate cause, the trial court charged that if the jury determined that the gun was defective and that the defect was a substantial factor in causing the injuries, the plaintiffs might recover even if there were other substantial factors contributing to the cause of those accidents. Appellants essentially maintain that even if the gun was defective, appellee was a substantial factor in causing his own injuries because he should not have carried this pistol in his pocket.[4] They also

4. The Excam model TA38S derringer is marketed as a pocket pistol.

assert that appellee is at fault on the basis that the business of operating a bar is not sufficiently dangerous to require the handling of a firearm. This is an obvious attempt to avoid a proper discussion of the law in Pennsylvania, which is clear. Strict liability requires only two elements of proof: that the product was defective and that defect was a proximate cause of the plaintiff's injuries. *See Berkebile v. Brantley, supra.* Even if appellee was negligent, he cannot be precluded from recovery in a strict liability case. *Id.* Only evidence of abnormal use is admissible for rebutting appellees' contentions of defect and legal cause. It is not a separate defense. *Id.* The jury instructions properly reflected Pennsylvania law.

 Lastly, appellants maintain that they are entitled to a new trial since they were precluded from introducing evidence of another lawsuit filed by appellees. Admittedly, appellants were attempting to undermine the credibility of appellee and his wife by painting them as litigious individuals. The court determined that the prejudicial impact of the evidence offered would have outweighed its probative value.

Appellants maintain that other jurisdictions have held that where a plaintiff who does not engage in hazardous activities has presented multiple claims arising out of multiple accidents prior to the one currently at issue, the probative nature of the evidence renders it admissible since it may point to the possibility of chance repetitions of similar accidents to the same person. While we are not bound by the determination of other jurisdictions, it is obvious that appellants' arguments are immaterial to the case at bar. There was no attempt on the part of appellants to introduce evidence that appellees had filed other lawsuits relating to defectively manufactured or designed products. The only evidence offered related to one automobile accident claim. This hardly supports the characterization appellants purported to make of the repetitious behavior of overly litigious individuals. The court properly precluded the introduction of the other lawsuit filed by appellees due to its potential prejudicial impact upon the jury.

Order affirmed.