516 A.2d 384

**William PASCONE and Tanya Pascone, Appellants,**

v.

**THOMAS JEFFERSON UNIVERSITY, Appellee.**

Superior Court of Pennsylvania.

Argued March 15, 1986.

Filed Oct. 15, 1986.

---

Barton A. Haines, Philadelphia, for appellants.

James Young, Philadelphia, for appellee.

Before WICKERSHAM, WIEAND and POPOVICH, JJ.

WIEAND, Judge:

The principal issue in this appeal following a defense verdict in an action of medical malpractice against Thomas Jefferson University is whether the trial court erred when it refused to allow the plaintiffs to introduce into evidence portions of the videotaped deposition of a defense expert who was not called to testify at trial. We conclude, for reasons hereinafter appearing, that the trial court did not abuse its discretion or commit error; and, therefore, we affirm.

In February, 1962, Tanya Pascone gave birth to a baby girl who had severe birth defects. The child received treatment at Johns Hopkins University Hospital in Baltimore, Maryland, but died within three months of birth. Following the death of their first child, Tanya Pascone and her husband, William Pascone, moved from their residence in Maryland to Philadelphia where, in 1963, Mrs. Pascone came under the care of various physicians in the Department of Obstetrics and Gynecology at Jefferson University. The Pascones apprised their physicians, who were employees of Jefferson University, with respect to the medical history of their first child and inquired whether there was a danger that another child would be born with similar birth defects. The Pascones were informed that such an occurrence was

unlikely. Based on this advice, Mrs. Pascone again became pregnant and, in 1964, gave birth to a normal, healthy boy. Tragically, however, history was repeated when, in 1968, another girl, Sonya, was born to Mrs. Pascone with birth defects similar to those of the first child.

The Pascones commenced an action against Jefferson University to recover damages for their emotional suffering and for the medical expenses which they had incurred as a result of Sonya's disabilities.[1] They contended that the hospital was vicariously liable for the negligence of hospital-employed physicians who had failed to determine and advise them, prior to conception of their daughter Sonya, that there was a likelihood that additional children would be born with congenital birth defects. At trial, liability was made to depend upon whether competent physicians, acting in accordance with accepted standards of practice within the medical community during the 1960s, should have been aware that the disabilities suffered by the Pascones' first child were genetically transmitted and thus could reappear in children subsequently born to them.

In defense of this issue, the hospital offered the testimony of Dr. William Beck, an obstetrician and gynecologist, who opined that in light of the state of genetic research during the relevant time period, a competent obstetrician would not have been expected to know the cause of the birth defects suffered by the Pascones' first child, would not have conducted independent research to determine the cause thereof, and would not have been expected to seek consultation with a geneticist. After the hospital had rested, the plaintiffs sought to rebut Dr. Beck's testimony by offering the cross-examination testimony of Dr. Kaighn Smith, whose pre-trial depositions had been recorded on videotape. Dr. Smith, a board certified obstetrician and gynecologist, had been retained by the hospital to give an expert medical opinion concerning the standards of medical

1. The Pascones also presented a claim on behalf of their daughter for her "wrongful life." However, this claim was dismissed prior to trial on a motion for summary judgment, and the dismissal is not before this Court for review.

care during the 1960s. Unsure of whether Dr. Smith would be available during trial, counsel for Jefferson University had caused Dr. Smith's deposition to be taken and recorded approximately two and one-half weeks before the scheduled trial date. The videotaped deposition of Dr. Smith included cross-examination which had been conducted by plaintiffs' attorney. By asking Dr. Smith during cross-examination to assume certain hypothetical facts, plaintiffs' counsel had been able to extract answers which plaintiffs believed would be helpful in showing that the hospital physicians had been negligent. In support of their motion to admit the videotaped cross-examination of Dr. Smith at trial, plaintiffs argued that because Jefferson University had deposed Dr. Smith for the sole purpose of using his testimony at trial, the trial had actually commenced upon the taking of his deposition and, therefore, Dr. Smith's testimony was already in evidence. In any event, the Pascones argued, the answers elicited from Dr. Smith during cross-examination contradicted the trial testimony of Dr. Beck and should be received for purposes of rebutting the same.[2]

The trial court ruled that plaintiffs could not use the answers extracted from Dr. Smith during cross-examination. The court reasoned (1) that answers given by the witness on cross-examination had been premised upon hypothetical facts which had not been proved during trial; (2) that the testimony which plaintiffs wished to present to the jury had been elicited by the use of leading and suggestive questions which, if Dr. Smith were to become plaintiffs' witness, would be objectionable; and (3) that Dr. Smith had refused to testify as a witness for the plaintiffs and to permit plaintiffs to use his depositions would be to force him to testify against his will.

We are unable to agree with the third reason advanced by the court for refusing to allow plaintiffs the use

2. Dr. Smith's direct testimony had been supportive of the defense view of the case and had not been even arguably favorable to the plaintiffs. The testimony which plaintiffs' counsel wished the jury to hear and which he referred to in his offer of proof had been elicited during cross-examination of Dr. Smith.

of Dr. Smith's deposition. Although Dr. Smith may have believed that he was giving testimony as a defense witness, the record discloses that he was fully aware that he was giving testimony via deposition for use at trial and that all or part of his testimony could be used for that purpose.

The evidentiary ruling of the trial court, however, must be affirmed if it was correct for any reason. See: *E.J. McAleer & Co. v. Iceland Products, Inc.*, 475 Pa. 610, 613 n. 4, 381 A.2d 441, 443 n. 4 (1977); *Gwinn v. Kane*, 465 Pa. 269, 279 n. 12, 348 A.2d 900, 905 n. 12 (1975); *Green v. Juneja*, 337 Pa.Super. 460, 464 n. 5, 487 A.2d 36, 39 n. 5 (1985); *Emerick v. Carson*, 325 Pa.Super. 308, 316 n. 2, 472 A.2d 1133, 1137 n. 2 (1984). "It is well settled that the admission of expert testimony is a matter within the sound discretion of the trial court, whose decision will not be reversed unless the court clearly abused that discretion." *Pirches v. General Accident Insurance Co.*, 354 Pa.Super. 303, 307, 511 A.2d 1349, 1351 (1986). See: *Schnabel Associates, Inc. v. T & M Interiors, Inc.*, 352 Pa.Super. 303, 305, 507 A.2d 1241, 1242 (1986); *Jackson v. Spagnola*, 349 Pa.Super. 471, 476, 503 A.2d 944, 947 (1986).

The admissibility of videotaped depositions is governed by Rule 4017.1 of the Rules of Civil Procedure. That rule states, in pertinent part:

(a) Any deposition taken upon oral examination may be recorded by videotape. Except as provided by this rule, *the rules of this chapter governing the practice and procedure in depositions and discovery shall apply.*

. . . .

(g) In addition to the uses permitted by Rule 4020 a videotape deposition of a medical witness or any witness called as an expert, other than a party, may be used at trial for any purpose whether or not the witness is available to testify. (emphasis added).

Rule 4020 provides, inter alia:

(a) At the trial, any part or all of a deposition, *so far as admissible under the rules of evidence,* may be used

against any party who was present or represented at the taking of the deposition or who had notice thereof if required, in accordance with any one of the following provisions:

. . . .

(5) A deposition upon oral examination of a medical witness, other than a party, may be used at trial for any purpose whether or not the witness is available to testify.

Pa.R.C.P. 4020(a)(5) (emphasis added). In general, the test of admissibility of a deposition under these rules is the same as that for the admissibility of like testimony offered by a witness on the stand in open court. 10 Goodrich-Amram 2d § 4020(a):10.

██ The law is clear that "[a] question assuming a fact not proved or admitted is improper and should be excluded." 98 C.J.S. *Witnesses* § 341. See: *Kirschman v. Pitt Publishing Co.*, 318 Pa. 570, 574, 178 A. 828, 829 (1935). See also: *McCormick on Evidence* § 14 (3d ed. 1984). In this case, not only did plaintiffs fail to prove many of the assumed facts underlying hypothetical questions asked of Dr. Smith on cross-examination, but a substantial portion of the assumed facts was actually disproved by other evidence offered during trial.[3] This is particularly significant when

**3.** To illustrate, many of the questions which had been posed to Dr. Smith during cross-examination were based on the following assumptions: that in 1967 a genetic counseling clinic was established at Jefferson University; that there existed a protocol at the hospital whereby expectant mothers who had previously given birth to deformed children were referred to the clinic; and that the obstetricians who treated Mrs. Pascone were aware that such counseling was available. These facts, the Pascones maintained, were supported by the deposition testimony of Dr. Laird Jackson, a professor of pediatrics and director of the Division of Medical Genetics at Jefferson University. Dr. Jackson's deposition, however, was not introduced into evidence by the Pascones at trial. Moreover, Dr. Jackson substantially contradicted these assumptions when he took the stand and testified live at trial. On cross-examination, Dr. Jackson testified as follows:

Q. Are you aware of whether there was any procedure, written or unwritten, at Jefferson at any time before July, 1968 which would have instructed the obstetricians to send to you for counseling a

it is remembered that plaintiffs' offer of Dr. Smith's deposition was made for the first time on rebuttal after the parties had fully presented their evidence and had rested their cases. Under these circumstances, we conclude, the trial court did not abuse its discretion by refusing to admit into evidence the videotaped cross-examination of Dr. Smith.

Moreover, "it has long been held that one may not lead his own witness with suggestive questions." *Rogan Estate*, 404 Pa. 205, 214, 171 A.2d 177, 181 (1961). The limitation on the form of questions which a party may ask his own witness is not modified by Pa.R.C.P. 4020(d) which

person who presented with a history of having a prior birth of a child which had died at the age of three months and had missing radius, died of a bleeding disorder?

A. There wasn't one at Jefferson then, there wasn't one at any hospital in Philadelphia and there isn't one now.

Q. Regardless of whether there was any procedure, would a competent obstetrician before July, 1968, in your opinion, have referred to you a patient who presented the history I've described when they reported to that obstetrician?

A. No, I don't think so.

Q. Why not?

A. Because I don't think they saw that the problem of recurrence or risk of recurrence of genetic disorders was a problem of paramount importance to them. It was way down on their priority lists. They did not see or did not realize that these things could become important to families. They did not see there were things that families could do to change what would happen to them, and it was simply not in their pattern of practice. It was not something they understood could be important to their patients.

Q. Should a competent obstetrician at any time before July, 1968 have recognized the symptoms reported in Mrs. Pascone's history as being a genetic problem?

A. No. I would say that these things—and by and large this is true today. The difference at present between today and then is not the obstetrician recognizes the problem as genetic, it's the obstetrician recognizes there may be somebody who can say that. So they send the patient to somebody who has that ability. Obstetricians still spend their time learning about things they can do to help the mother during the course of the pregnancy, and they learn who they can call upon for help for other things. And I think the key differences are two: They recognize some of those problems can be helped by others and they recognize other people who are around or can help that. In 1967 or 1968 most of us [who] were doing that were unknown to the obstetricians, or almost unknown.

N.T. at 12.47–12.50.

permits the introduction of deposition testimony by either party. 10 Goodrich-Amram 2d § 4020(d):2. "The distinction, applicable to live witnesses called to the stand, between the direct examination form of questioning and the cross-examination form of questioning, remains fully applicable." *Id.*

■ In the instant case, although plaintiffs wanted the jury to hear their cross-examination of Dr. Smith, they were making him their own witness when they offered into evidence his deposition testimony. See: Pa.R.C.P. 4020(d). As the Pascones' witness, Dr. Smith could not testify by way of leading questions asked by plaintiffs' counsel. This was true just as if the doctor's testimony had been given from the witness stand in open court. A review of the transcript of Dr. Smith's deposition reveals unequivocally that the questions asked of him on cross-examination were hypothetical in form and were thus, by their very nature, suggestive and leading.

The Pascones argue that Dr. Smith was a "hostile witness" and, therefore, that the use of leading questions was proper. We disagree. Dr. Smith cannot be characterized as a hostile witness merely because Jefferson University was the party which scheduled his deposition. Moreover, there is nothing in the transcript of Dr. Smith's testimony to suggest that he was unwilling or even reluctant to answer the questions posed to him by plaintiffs' counsel on cross-examination. Therefore, the use of suggestive questions could not be justified on the ground that Dr. Smith was, at the time of his deposition, a hostile witness.

■ We also find meritless the argument made by appellants that trial had commenced when Dr. Smith's depositions were taken for later use. Nothing in the record of this case even remotely suggests that the parties considered the taking of Dr. Smith's videotaped deposition to be the initiation of trial proceedings. Indeed, Dr. Smith's deposition had been taken only for use at trial *in the event he was not available to testify* at trial. Appellants would have us

hold that where a party takes the deposition of a medical expert with the intention of using it at trial, that party is bound by the expert's testimony and must in all events present the deposition to the jury. Such a conclusion, however, would be in direct contradiction of Pa.R.C.P. 4020(d) which provides: "A party shall not be deemed to make a person his own witness for any purpose by taking his deposition. The introduction in evidence of the deposition or any part thereof ... makes the deponent the witness of the party introducing the deposition [at trial]." Under this rule, it seems clear and we therefore hold that Dr. Smith's deposition was not in evidence prior to the commencement of trial proceedings.

Having considered piecemeal the individual arguments made by the Pascones on this appeal, it is now time to step back and look not at the trees but at the forest. When this is done it becomes quite clear that plaintiffs are not entitled to a new trial because of the evidentiary ruling which excluded Dr. Smith's deposition testimony. The issue upon which liability was to be determined was whether physicians, practicing according to medical standards in effect during the 1960s, should have been aware that the birth defects experienced by the plaintiffs' first child were genetically transmitted and likely to reoccur in children subsequently conceived and born to them. A careful examination of Dr. Smith's deposition testimony discloses that during both direct and cross-examination he maintained unequivocally and consistently that obstetricians practicing in the decade between 1960 and 1970, including those practicing at Jefferson University, could not then be expected to know that birth defects suffered by plaintiffs' first child were genetically transmitted. Moreover, he said, physicians would not then have been required and would not have been expected by then prevailing standards to investigate further the cause of the child's maladies. By suggestive hypothetical questions, however, plaintiffs' counsel was able to extract answers suggesting that under certain hypothetical circumstances the physicians might possibly have been

deemed negligent. At trial, after plaintiffs and defendant had rested, the circumstances on which the hypothetical questions had been premised remained unproved and, in fact, had been disproved in part. The trial court's evidentiary ruling which denied plaintiffs' attempt to use the cross-examination portion of the videotaped depositions of Dr. Smith, under these circumstances, was not legally erroneous, was not an abuse of the trial court's discretion, could not have resulted in a different verdict, and does not warrant the granting of a new trial.

Appellants also contend that the trial court committed error when it permitted counsel for Jefferson University to cross-examine Dr. Laird Jackson beyond the scope of direct examination. Dr. Jackson was called by the plaintiffs to testify to the content, compilation, and completeness of certain medical records which had been kept by the hospital's Genetic Counseling Clinic during the late 1960s. On cross-examination, Dr. Jackson was permitted, over objection, to testify to the prevailing standard of practice in the medical community during the relevant time period. Wide latitude was afforded Jefferson University during cross-examination because, the court said, it was questionable whether Dr. Jackson would be available for recall as a witness by the defense and also in the interest of clarity to aid the jury's understanding of his entire testimony. The court advised plaintiffs' counsel that he would be allowed to cross-examine Dr. Jackson fully regarding matters covered by defense examination of the witness, and plaintiffs' counsel did in fact cross-examine Dr. Jackson fully with respect thereto.

■ Ordinarily, cross-examination should be limited to matters brought out on direct examination. *Woodland v. Philadelphia Transportation Co.*, 428 Pa. 379, 385, 238 A.2d 593, 596 (1968); *Magnavox Co. v. Royson Engineering Co.*, 195 Pa.Super. 139, 144, 169 A.2d 559, 561–62 (1961). The scope or limitation of cross-examination, however, "is largely within the discretion of the trial judge, and his action will not be reversed on appeal in the absence of an

abuse of that discretion or unless obvious disadvantage resulted therefrom." *Rohr v. Logan,* 206 Pa.Super. 232, 239, 213 A.2d 166, 171 (1965). See: *Townsend Will,* 430 Pa. 318, 323, 241 A.2d 534, 537, *cert. denied sub. nom., Cochran v. Morris,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968); *King v. Holt,* 200 Pa.Super. 431, 435, 188 A.2d 760, 762 (1963). See also: *Kemp v. Qualls,* 326 Pa.Super. 319, 324, 473 A.2d 1369, 1371 (1984). Although the trial court in the instant case permitted Dr. Jackson to be asked about matters which exceeded the scope of direct examination, the Pascones have failed to identify any disadvantage suffered by them as a result of the exercise of the trial court's discretion. We, too, have been unable to perceive any disadvantage to the plaintiffs because of the trial court's decision to allow Dr. Jackson to testify fully during one and the same appearance as a witness. Because the court's decision to broaden the scope of cross-examination was not prejudicial to the Pascones, but was made out of courtesy to the witness and in the interest of proceeding expeditiously, we conclude that there was no abuse of discretion.

Judgment affirmed.

POPOVICH, J., concurs in the result.