671 A.2d 726

**Francis SPINO and Louise Spino, Appellants,**

**v.**

**JOHN S. TILLEY LADDER COMPANY, and M.A. Buten & Son, Inc., Appellees.**

Superior Court of Pennsylvania.

Argued May 16, 1995.

Filed Feb. 9, 1996.

328

330

332

Francis X. Nolan, Philadelphia, for appellants.

Barbara S. Magen, Philadelphia, for appellees.

Before McEWEN, JOHNSON, and BROSKY, JJ.

McEWEN, Judge:

Appellants, Francis and Louise Spino, have taken this appeal from the verdict entered in favor of appellees, the John S. Tilley Ladder Company (hereinafter "Tilley") and M.A. Buten & Sons, Inc. (hereinafter "Buten"), following a jury trial in this action seeking compensation for injuries sustained by Louise Spino when she fell from a household ladder manufactured by Tilley and sold to her husband by Buten. Appellants

have framed their arguments in support of their request for a new trial, as follows:

In this 402A case involving defective design of a product, did the trial court err by creating an immunity for the defendant by permitting the defendant to introduce negligence principles that since defendant did not have prior knowledge of the product's dangerous propensities, the product could not be defective?

Did the trial court err in refusing to permit plaintiff's expert to opine that safety devices (anti-split devices) used by defendant Tilley on its other ladders to prevent splits would have prevented the split in this case, and where the defendant's experts did opine that the anti-split device was unnecessary?

Did the trial court err by permitting defendant Tilley to introduce expert testimony that was entirely speculative, without factual basis, admittedly not causally related to the split, was irrelevant, and insufficient for defendant to meet its burden of proof on foreseeability where one expert admitted that their proof was contradictory and the other admitted that he really did not know what happened to the ladder, and where conclusions were permitted without factual or scientific basis that some unidentified "external force" was responsible for creating the split, and where these errors were compounded by not correcting the verdict slip to identify for the jury exactly what "defect" was at issue, i.e. the allegedly pre-existing split or a number of maintenance items having nothing to do with the split, and where Tilley completely ignored its burden of proof on foreseeability as to any alleged misuse or abuse?

Did the trial court err when it refused to permit plaintiff to call defense expert, Dr. Toland, who examined plaintiff and did not testify, where plaintiff was not permitted to testify that he examined her for the defendant, and where the trial court then refused to give an adverse inference charge?

Did the trial court err by permitting Tilley to cross-examine plaintiff's expert on how much he earned on matters not connected with the present case?

Did Tilley create prejudicial error in this 402A case by referring to a "medical malpractice crisis in litigation" for the purpose of appealing to the prejudices and passions of the jury?

The learned Judge John W. Herron has provided, in his able opinion issued in connection with the denial of post-verdict motions, the following summary of the evidence produced at trial:

Louise Spino and her husband, Francis, together purchased a Type 3 ordinary household wood ladder in 1983 at a local retail paint store. The ladder was manufactured by defendant John S. Tilley Ladder Company and, according to expert testimony, was designed to accommodate ordinary household usage (as opposed to heavier and more rigorous commercial and construction usages for which defendant Ladder Company's Types 1 and 2 ladders were designed). Plaintiffs never challenged the fact that the ladder in issue was intended for usage restricted to a 200 pound weight bearing load or that Mr. Spino weighed 220 pounds at the time of purchase.

On the day following purchase, Mr. Spino used the ladder for a household painting project that included the Spinos' bedroom, dining room and living room. Mr. Spino testified that he only used the ladder for painting projects. Mrs. Spino used it two or three times per year to wash windows or hang curtains. When not in use, the ladder was stored at the foot of the stairs in plaintiffs' basement.

At the time of trial, this ladder showed evidence of labels but no one was able to decipher at that time what was written on the labels because one was covered with paint and another was partially worn away. The Spinos acknowledged, however, that at some point they had looked at the labels but never read them. Mr. Robert Howland, President of defendant Company, testified (via videotaped deposition) that there were labels on the Company's Type 3 household ladder as manufactured and sold which warned against standing on or above the second step down from the top and against use in a damaged condition.

In November 1986, the ladder was brought up from the basement by Mr. Spino. While he was away from the home at work, Mrs. Spino set the ladder up in her kitchen, placed a bucket of water on the ladder shelf, and climbed the ladder. Her intention was to clean the kitchen ceiling and, according to her trial testimony, as she reached her arm up toward the ceiling, she heard a cracking sound, the ladder shook, and the next thing she recalls was that she was on the floor. Mrs. Spino was taken by rescue squad to a local hospital where emergency room records note that she "lost her balance and fell four feet. . . ." Later in the week, while still hospitalized, she told her husband that she did not know how the accident happened.

Mr. Spino testified that when he returned home from visiting his wife at the hospital on the evening of the accident, the ladder already had been removed from the kitchen and placed at the foot of the stairs in the basement by the Spinos' son who lived nearby. Subsequently, in anticipation of the return of his wife from the hospital some weeks later, Mr. Spino decided to repaint the bedroom. Mr. Spino testified that, upon setting the ladder in place, he noticed a split in the rear left leg and thereafter made no attempt to use it. Mrs. Spino testified that she was unaware of any further use of the ladder following her accident.

Conflicting expert testimony was presented at trial by the parties. It was plaintiffs' contention that the split in the ladder leg occurred at the time of the accident and, further, that the ladder's design was defective in its failure to include an anti-split plate device of the same type found on defendant's commercial and construction ladders (Types 1 and 2). In the opinion of plaintiffs' expert, the lack of the anti-split device in the design of defendant's Type 3 household ladder rendered the ladder not safe for its intended use.

In contrast, defendant's expert witness, Professor George H. Kyanka, testified at length to his opinion that there was no design defect in the product and, further, that, based on his examination of the ladder in issue, the ladder showed

evidence of wear on the second step down from the top and, also, that the crack in the ladder leg had occurred at some time prior to the accident. Indeed, it was the defendant's contention that the accident occurred as a result of use of the ladder in an existing weakened and wobbly condition which was dangerous and contrary to the manufacturer's warning labels.

The jury, in response to special interrogatories, found that the ladder was not defective and this appeal followed.

I. *Introduction of Evidence of the Absence of Prior Accidents.*

A plaintiff must prove two elements in order to establish a cause of action in products liability: One, that the product was defective and two, that "the defect in the product was a substantial factor in causing the injury. *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975)." *DiFrancesco v. Excam Inc.,* 434 Pa.Super. 173, 177–78, 642 A.2d 529, 531 (1994), *allo. granted,* 540 Pa. 599, 655 A.2d 988 (1995). *Accord: Dietrich v. J.I. Case Co.,* 390 Pa.Super. 475, 481–82, 568 A.2d 1272, 1275 (1990), *allo. denied,* 528 Pa. 610, 596 A.2d 157 (1991). Additionally, the plaintiff must prove that the defect in the product existed at the time the product left the defendant's control. *Roselli v. General Elec. Co.,* 410 Pa.Super. 223, 228–30, 599 A.2d 685, 688 (1991). The issue for resolution by the jury in a strict products liability case where the plaintiff alleges that the product is unreasonably dangerous as a result of a *design defect* is whether the product should have been *designed more safely* by the manufacturer. *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 22, 56–58, 485 A.2d 408, 426 (1984).

Appellants contended that the Type 3 household ladder manufactured by appellee, which had a duty rating of 200 pounds, was defective as a result of the absence of an anti-split device similar to the ones which appellee places on its Type 1 and Type 2 industrial and commercial grade ladders, and that the absence of the device caused Mrs. Spino's fall.

Appellee Tilley maintained that the ladder had been proper-
ly designed for its intended household use for loads of less
than 200 pounds, and that the absence of the anti-split device
was not a defect and had not contributed in any way to Mrs.
Spino's accident. Appellee sought to prove at trial that the
18–inch split in the upper portion of the rear leg had existed
before the use of the ladder by Mrs. Spino and had been
caused not by any weight applied to the steps of the ladder,
but by an unusual event which resulted in the application of a
twisting force to the rear legs of the ladder. To support these
contentions, appellee presented the expert testimony of Dr.
Kyanka, who testified, *inter alia:*

[T]here is a split in the left rear rail near the top, running
down below the level of the second step down. There is a
portion of what is the third step down from the top that's
been broken off. And the right spreader, the metal arm
that separates the front and back, has a dent in the center.
It's been pushed down below its original line of action.

\* \* \* \* \* \*

The hardware on the ladder, under the steps there is a wire,
a rod that runs under the step. That rod runs at a slight
angle to the step. The function of that is to hold the two
side rails together, essentially tie the ladder into one piece.
It acts sort of like shoelaces on a shoe. You tighten them
up and they hold the sides together. Those wires on this
ladder are essentially all loose. Most of the nuts you can
turn with your fingers, so the ladder is—sways. It's very
flexible. I think that's—I think those were the main items
in terms of the general condition of the ladder. So it was
quite loose and exhibited the characteristics I just men-
tioned.

\* \* \* \* \* \*

These rods, which are called truss rods that go under the
steps, many of them are so loose I can spin the washers
around. They're quite—quite loose. That one doesn't spin.
This one does. The nuts on the other side aren't tight.
They also can be turned by use of your fingers. What this

does is loosen the ladder up sideways. And, in fact, if you look at the steps, you can see little gaps at the edges of the steps, the left and the right. If these nuts were tight, the side rails would be pulled together and these steps would be fitting tighter into the slots. That makes the ladder more rigid sideways, resistant to lateral motion.

Of course, the main problem with the hardware on the rail is this left rear rail has been separated from the top cap hardware that holds it on. The rivet that was used to hold the left rear rail in place is still there. And I measured its length and compared it with the right rear rivet and they're the same. I measured the width of the left rear rail and the right rear rail, and they're the same. The heads on the rivet look the same, so I'm assuming they were put in the same way. The rivet itself is not significantly bent or deformed. It doesn't show any structural damage. It's the correct diameter. And basically what that relates to is the fact this rivet acts as a hinge, basically. It allows you to swing the front of the ladder out and set it up in its proper position.

\*　　\*　　\*　　\*　　\*　　\*

Well, the end of the bucket shelf has been broken off. It moves back and forth laterally very easily, indicating again the ladder has swayed quite a bit when it's been used.

Another aspect of the contact or wear is at the top of the right left—the top of the left rear rail also is rounded on one end where it originally was square, and that would be again due to any movement that would force it into the front rail. There is a region on the front rail that matches up with that area and there is no sharp dent that would indicate that the two pieces were pushed together so the sharp end of the rear rail would cause a dent in the wood or, excuse me, on the wood of the front rail, so it appears to be a gradual erosion or rounding of the end of the left rear rail.

So all those—the spreader, the rods, the broken paint tray, the split in the rail, the wear pattern around the left rear rail, the loosened hardware and the ease with which the

ladder moved sideways indicates it was probably flexible at the point where the accident occurred.

Q. Are you able to determine whether or not the split existed, the split in that left rear leg existed at or before the time the accident occurred?

A. Yes.

Q. What is your opinion in that respect?

A. Well, I think it existed before the accident occurred due to several—several different factors.

Q. Could you list each of those several different factors, please?

A. Yes. One of them is the presence of paint in the split. Of course, that can be seen by moving the wood around, looking in from either side, you can see paint droplets inside the split. And if the ladder had a pre-existent split, there would be opportunity for paint to move in there; otherwise, it shouldn't have gotten there.

The color of the wood inside the split, for example, as you open this up—I don't want to open it up too far—and look inside you'll see the color of the wood inside isn't much different than the color of the wood outside. Since wood discolors, it oxidizes like a lot of other things when it's exposed to the air, if this thing had broken relatively recently compared to the age of the ladder and had been held shut, the wood inside would look like fresh wood or a kind of pink color. Instead it shows some changes in color. This rounding pattern around the rivet that I just discussed in my opinion could only be produced by using the ladder, opening and closing and climbing it after the split had occurred, allowing this movement to take place.

\* \* \* \* \* \*

Q. Dr. Smith said that the ladder moved as a result of the crack or the split of the ladder while Mrs. Spino was standing on it. If the ladder cracked when Mrs. Spino was standing on it and moved, would there be any physical evidence of that movement on the ladder today?

\* \* \* \* \* \*

A. Well, if the ladder failed by a split followed by some movement, first of all, the movement would have to be limited by something on the ladder. It could only move to a certain point and then it would stop because it didn't fall over. .

\* \* \* \* \* \*

... There is no dent in the rear of the rail and there is no dent in the top cap where it would strike it, none whatsoever. The wear and the abrasions are here on the front, which doesn't even hit the top cap. *So there is no evidence that any major motion, a split followed by the ladder moving, ever took place. Nothing in marks. And in fact the marks showing motion are on the wrong side of the rail according to that theory.* They're on this, your left side and they should be back here on the rear. This is perfectly square. (emphasis added)

\* \* \* \* \* \*

One of the main characteristics of wood that you look for to get wood with a good straight line so it should break in a nice straight line, so this breaks in a nice straight line. Also that type of break, this type of a split is usually due to what is called a torqual or twisting load. If I took this and twisted it hard enough this way, I could get it to split. That's a torque or twisting load or, in the case of this, could be due to an inward load from the back side against the rivet. Either one of those types of loads is not what you get in climbing a ladder. Basically climbing a ladder you get vertical loads and a little left to right motion but very little twisting, very little torque of these rails, and they carry very small force, as we mentioned or as I mentioned, so the—the possibility of getting that type of a split from climbing is not—is not large at all. So it demonstrates the wood was good, which I already said anyway, and also that one mode of why it could have split is in fact the twisting, which you can do with a wooden pencil. Take a pencil, can twist it, it splits right up. You twist a tongue depressor, it does the same thing. That's due to the torque or twist on the wood.

Q. Are you able to determine what did cause the split?

A. Yes. In my opinion, *the split was caused by either a twist or a front to back force, meaning into or on the rear rail that would cause it to*—(emphasis added)

Q. You're indicating with your hand a force perpendicular to the length of the rear leg, is this a correct description?

A. It could be from the back of the ladder, for example, as I said, in which case it's certainly nowhere that you should be getting any kind of load on the ladder. There is—as an illustration, if the ladder fell over forward, the front end of the paint tray is broken off. If the ladder fell forward and landed on the paint tray, just landed on the paint tray, that would produce—it would do the same thing as a backward to frontward type load. I'm not going to do this but I think if you visualize what I'm saying, just dropped this on the paint tray, it would have a tendency to pop the both left and right rear rails off. So that's one possibility of the paint tray were open and the ladder tipped.

Q. Would an anti-split device have prevented the split which we now see in that ladder?

A. Anti-split device is above where the split would have tried to occur if it fell on the paint tray, for example, so in my opinion I don't feel the anti-split device would have necessarily prevented this since *I don't think the force that created it is anything you normally get in a ladder or anything that an anti-split device is expected to resist.* (emphasis added)

Q. Is an anti-split device intended to resist torqual splits?

A. No. *In fact, as I indicated, if you twist a pencil you can get the split to start in the middle and it will run to the ends.* It doesn't split necessarily at the ends, which is where the anti-split device is. (emphasis added)

Q. Does an anti-split device prevent splitting from impact loads?

A. No. Let me rephrase that. No. It will help, certainly, if the impact load is in the vicinity of the device, but

generally speaking is not designed for that. It's designed to resist other types of forces.

Tilley introduced evidence, via the testimony of Robert G. Howland, President of the Tilley Ladder Company, that the company had manufactured over 100,000 Type 3 household ladders in the 30–year period from 1950 when he had commenced employment with the Company and neither he nor any other employee had ever been informed of a failure similar to the one alleged by appellants.

Appellants contend that the introduction of such evidence over objection requires the award of a new trial as it impermissibly interjected negligence principles into a 402A strict products liability action. Appellee maintained that the evidence was *relevant to prove that the ladder had not failed as alleged by appellants* and not to prove that Tilley had been free of negligence in continuing to manufacture and market the Type 3 household ladder without providing an anti-split device.

Before beginning an analysis of the evidentiary rulings involved, it is important that we remain mindful of the broad and sound social policy which underlies a seller's liability as established by the Restatement (Second) of Torts, § 402A. Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The social policy sought to be effected by the implication of the seller's liability is very basic, very simple and very sound. As between an innocent user of a product and a manufacturer or seller who is engaged in the business of manufacturing or selling a product, risk of loss for injuries resulting from the use of a defective product shall be borne by the manufacturer and/or seller. *Salvador v. Atlantic Boiler Co.*, 457 Pa. 24, 31–32, 319 A.2d 903, 907 (1974). *See: Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966) (§ 402A adopted as the law of Pennsylvania).

With this guiding principle in mind, one can readily analyze the application of liability under § 402A. In a product liability case, principles of negligence have no place. *Dambacher By Dambacher v. Mallis*, 336 Pa.Super. 22, 27, 485 A.2d 408, 428 (1984). Liability does not focus upon a manufacturer's reasonableness in the design or manufacture of the product. Nor does it concern the manufacturer's use of "state of the art" concepts. Rather, liability rests where there is a defect in the product which caused injury to the user. Whether or not the defect was known or could have been anticipated at the time of the design or manufacture is of no concern. *Id.*

*Majdic v. Cincinnati Machine Co.*, 370 Pa.Super. 611, 616–17, 537 A.2d 334, 337 (1987) (en banc), *allo. denied*, 520 Pa. 594, 552 A.2d 249 (1988).

■■■ Appellants correctly argue that since evidence of negligence is irrelevant in a strict products liability case, evidence of a defendant's due care must also be excluded as irrelevant and prejudicial since it could serve as an inappropriate basis upon which a jury might mistakenly return a verdict for a defendant manufacturer. Appellants contend that the admission of the evidence concerning the absence of any knowledge on the part of Tilley of any similar accidents involving their Type 3 household ladders was evidence of due care and requires the award of a new trial.

Our standard of review for rulings on the admission of evidence is well settled. "It has long been clear that questions regarding the admissibility or exclusion of evi-

dence are within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. An abuse of discretion requires prejudice, bias, ill-will, or misapplication of law." *Rogers v. Johnson & Johnson*, 401 Pa.Super. 430, 436, 585 A.2d 1004, 1007 (1990) (citation omitted). "In assessing the propriety of the trial court's actions, a fundamental consideration in determining the admissibility of evidence is its relevance. Evidence is relevant if it tends to make a fact at issue more or less probable." *Majdic v. Cincinnati Machine Company*, 370 Pa.Super. 611, 618, 537 A.2d 334, 338 (1987) (citation omitted).

*Harkins v. Calumet Realty Co.*, 418 Pa.Super. 405, 412–13, 614 A.2d 699, 703 (1992). *See: Martin v. Soblotney*, 502 Pa. 418, 421–22, 466 A.2d 1022, 1024 (1983); *Burch v. Sears, Roebuck & Co.*, 320 Pa.Super. 444, 454–56, 467 A.2d 615, 621 (1983).

■ It is well settled that in Pennsylvania, evidence of due care by a defendant is irrelevant to the issue of the liability of a manufacturer in a products liability case and thus inadmissible since a manufacturer may be strictly liable even if it has used the utmost care in designing and manufacturing a product. Appellee concedes that evidence of the reasonableness or due care of the defendant in *designing* the ladder is irrelevant and inadmissible, *see, e.g., Lewis v. Coffing Hoist Div., Duff–Norton Co., Inc.*, 515 Pa. 334, 342–44, 528 A.2d 590, 594 (1987); *Majdic v. Cincinnati Machine Co., supra* at 618–21, 537 A.2d at 338–39, but argues that, since the evidence was offered solely for purposes of rebutting the appellants' evidence on causation, the trial court properly ruled the evidence admissible.

■ Appellant, in response, contends that evidence which tends to show reasonableness and due care on the part of the manufacturer must be excluded due to its potentially prejudicial effect even if offered to disprove *causation*. While we find the issue one not easily resolved, we believe that the better course, and the one which our Supreme Court will

adopt, is that such evidence is admissible, on the issue of *causation,* in conjunction with appropriate cautionary instructions from the court.

 Numerous Pennsylvania appellate court cases have analyzed the admissibility—in the plaintiff's case in chief in a products liability action—of evidence of other similar accidents involving the product and found such evidence relevant and admissible:

> A product's "defective condition" may be proven through circumstantial evidence such as the occurrence of similar accidents. *Cornell Drilling Co. v. Ford Motor Co.,* 241 Pa.Super. 129, 139, 359 A.2d 822, 827 (1976). Evidence of similar accidents occurring at substantially the same place and under the same or similar circumstances is generally admissible to prove a manufacturer's constructive notice of a dangerous or defective condition. However, the admission of such evidence is tempered by judicial concern that the evidence may raise collateral issues which confuse both the real issue and the jury. These matters are vested within the sound discretion of the trial court. *Whitman v. Riddell,* 324 Pa.Super. 177, 180–82, 471 A.2d 521, 523 (1984). To constitute reversible error, a ruling on evidence must be shown to be erroneous and harmful to the complaining party. *Id.,* [324 Pa.Super. at 177–79] 471 A.2d at 521, quoting *Anderson v. Hughes,* 417 Pa. 87, 90–92, 208 A.2d 789, 791 (1965).

*Majdic v. Cincinnati Machine Co., supra* at 623–24, 537 A.2d at 340–41. *Accord: Harkins v. Calumet Realty Co., supra* at 414–15, 614 A.2d at 704 (evidence of prior occurrences of cottonoid becoming detached from string during surgery precluded due to the absence of evidence that the prior incidents involved the same or similar circumstances). *Cf. DiFrancesco v. Excam Inc., supra* at 185–87, 642 A.2d at 535 ("evidence concerning other incidents involving the instrumentality that causes a plaintiffs' harm may be relevant to a number of issues. It may tend to show that the instrumentality was unsafe.... This evidence is admissible, however, only when the evidence concerns incidents sufficiently similar to the incident involving the plaintiff which occurred under similar

circumstances."); *Rogers v. Johnson & Johnson Products Inc.*, 401 Pa.Super. 430, 436–37, 585 A.2d 1004, 1007 (1990) ("trial court reasonably could conclude that the similarities outweighed the differences for the purpose of establishing whether Johnson & Johnson had notice of malfunctions.")

 Thus, while evidence of other occurrences involving an allegedly defective product may be admissible in the plaintiff's case in chief to show (1) the existence of a defective condition, (2) causation, or (3) notice of the defect, such evidence is admissible only if the plaintiff first establishes a substantial similarity of conditions between the prior incident and the incident giving rise to the plaintiff's cause of action.

Although we have been unable to find a Pennsylvania appellate court decision directly addressing the admissibility of such evidence on the issue of causation in the *defendant's case*, this Court in *Orlando v. Herco, Inc.*, 351 Pa.Super. 144, 505 A.2d 308 (1986), addressed a related evidentiary issue in an action based upon an alleged breach of the implied warranty of merchantability. The plaintiff in *Orlando* contended that he had become ill as a result of consuming shrimp creole at the Hotel Hershey. The trial court, over objection, permitted the Hotel to introduce evidence

> that on the same evening on which Orlando became ill, twenty other guests had ordered shrimp creole and had not complained of illness. It is correct, as appellant argues, that the issue for determination by the jury was whether the portion served to Orlando was unmerchantable and not whether the shrimp creole sold to other guests was defective. Nevertheless, the fact that all other shrimp creole sold that evening, prepared at the same time and using common ingredients, was found to be fit for human consumption was a relevant fact for the jury to consider. Although not conclusive with respect to the wholesomeness of the shrimp creole sold to Orlando, it could be considered and weighed by the jury.

*Id.* at 148, 505 A.2d at 310. The *Orlando* Court noted that while it is not necessary to establish negligence in order to recover on a breach of warranty claim, "it does not follow that

evidence showing the absence of a defect is inadmissible *merely because it also tends to show that due care was exercised* in the product's preparation or manufacture." *Orlando, supra* at 147, 505 A.2d at 309 (emphasis added).

Our esteemed colleague Judge Donald E. Wieand, in addressing the issue of whether evidence showing contributory negligence on the part of a plaintiff in a products liability action was properly excluded by the trial court due to its potential for prejudice and confusion of the jury, held that where evidence was admissible for the purpose of showing *causation* in a products liability action, it could not otherwise be excluded *merely because* it also tended to show " 'contributory negligence' on the part of the operator." *Bascelli v. Randy, Inc.,* 339 Pa.Super. 254, 259, 488 A.2d 1110, 1113 (1985). *See also: Foley v. Clark Equipment Co.,* 361 Pa.Super. 599, 626–630, 523 A.2d 379, 393–394 (1987), *allo. denied,* 516 Pa. 614, 531 A.2d 780 (1987).

Appellants in the instant case urge the adoption of a *per se* rule of exclusion of *all evidence* relating to the absence of any evidence of a prior product failure in a design defect case. While we agree that such evidence does raise concerns over creation of collateral issues and jury distraction, we are not persuaded that the dangers of distraction outweigh the probative value of such evidence so as to require adoption of such a rule.

Courts of other jurisdictions have concluded, as we do, that such evidence may be admitted if relevant to a contested issue of causation, under appropriate instructions from the court and subject to the exercise of the trial court's discretion as to the probative value of the evidence, where the requirement of substantially identical circumstances is satisfied. *See, e.g.: Espeaignnette v. Gene Tierney Co., Inc.,* 43 F.3d 1, 9–10 (1st Cir.1994) ("The fact that the Company had received no reports of similar accidents tends to disprove causation. That there were no similar reports of injuries due to inadvertent contact with the infeed rollers tends to support the Company's contention that it was not possible for Espeaignnette to have stumbled accidentally into the open area of the edger as he

alleged.") (applying Maine law); *Harrison v. Sears, Roebuck & Co.*, 981 F.2d 25, 30 (1st Cir.1992) ("Although appellants claim that the negative evidence is irrelevant and inadmissible to prove causation, they offer no authority to support that proposition and such evidence has been admitted in past cases.") (applying Massachusetts law); *Bilski v. Scientific Atlanta*, 964 F.2d 697, 700 (7th Cir.1992) ("Under Illinois law, '[e]vidence tending to show an absence of prior accidents is generally admissible only if the offering party lays a proper foundation by establishing that the absence occurred while others were using a product similar to that which caused plaintiff's injury.'"). *Cf. Klonowski v. International Armament Corp.*, 17 F.3d 992, 996 (7th Cir.1994) ("Such evidence is only admissible when the party seeking to introduce the evidence establishes that the lack of accidents was in regard to products that are 'substantially identical to the one at issue and used in settings and circumstances sufficiently similar to those surrounding the machine at the time of the accident to allow the jury to connect past experience with the accident sued upon.'") (applying Wisconsin law); *Rocky Mountain Helicopters, Inc. v. Bell Helicopters, Div. of Textron, Inc.*, 805 F.2d 907, 919 (10th Cir.1986) ("Bell also appeals rulings by the district court excluding deposition testimony to the effect that Bell had never experienced prior trunnion failure.... The evidence offered does not seem to be specifically concerned with the particular model of trunnion that was in use at the time of the accident, nor does the deposition contain any evidence regarding Bell's experience with that model of trunnion on aircraft used in logging operations."); *Balsley v. Raymond Corp.*, 232 Ill.App.3d 1028, 1029, 175 Ill.Dec. 493, 494, 600 N.E.2d 424, 425 (1992) ("[E]vidence of an absence of prior accidents or incidents is admissible when the party offering the evidence establishes a foundation that the absence of other accidents occurred when the same product was used and that the product was used under conditions substantially similar to those in which the plaintiff used the product.").

In summary then, appellants asserted that the split occurred while Mrs. Spino was on the ladder, that the anti-

split device would have prevented the split, and that the ladder was thereby of defective design. Appellee sought, through the testimony that appellee had manufactured approximately 100,000 such ladders over 30 years and was unaware of a similar mishap, to refute the threshold assertion of appellants that the split had occurred while Mrs. Spino was on the ladder. The trial court ruled the testimony admissible only after conducting an *in camera* review of a chronological log, maintained by appellee, of reported claims covering the appellee's ladder products, including its wooden Type 3 ladders, and satisfying itself that the log was a contemporaneous and comprehensive record of all reports of claims or problems which the Company had received from any source.

Since there is no law of physics to preclude the *possibility* of the assertion of appellant, an early issue for the jury to resolve was the *probability* of the version of appellant. Clearly, implications of probability arise—thereby rendering the information relevant—if the jury anoints as fact the assertion of the president of appellee that 100,000 such ladders were manufactured over 30 years without similar mishap. Thus, we are of the mind that the trial court, having determined that appellee maintained a reliable product problem history system, had a sufficient factual basis to properly determine that such testimony was admissible.

Once the trial court determines such assertions are relevant and admissible, the evidence must, of course, still survive the test of its weight for there are ample aspects of such evidence upon which an able cross-examiner may feast. It merits emphasis, however it may be otherwise undisputably clear, that the issue here addressed defies pronouncement of a *per se* principle since it remains for the trial judge in each case, as the offer of proof is considered, to weigh all of the attendant factors in an assessment of the relevancy and probative value of the proffered evidence. As we have stated, the trial judge here properly exercised the discretion vested in our trial courts for disposition of evidentiary issues.

We, therefore, decide that, since the issue is not subject to *per se* rule, where the threshold requirement of abundant

situations of substantially identical circumstances is substantiated, admission of evidence of the absence of similar accidents *to rebut evidence of causation* is a matter committed to the sound discretion of the trial court in conjunction with such instructions as the trial court deems appropriate.

## II. *Challenge to Expert Testimony Based on Lack of Factual Basis.*

Appellants next argue that they are entitled to a new trial, based upon the admission, over objection, of the expert testimony of Dr. Kyanka where that testimony was "entirely speculative [and] without factual basis." Rulings on the admissibility of expert testimony are committed to the sound discretion of the trial court whose decision thereon will not be disturbed in the absence of a clear abuse of that discretion or an error of law resulting in prejudice to the complaining party. *Dolan v. Carrier Corp.*, 424 Pa.Super. 615, 618–19, 623 A.2d 850, 852 (1993); *Gemini Equip. Co. v. Pennsy Supply, Inc.*, 407 Pa.Super. 404, 412–15, 595 A.2d 1211, 1215–16 (1991); *Smick v. City of Philadelphia*, 161 Pa.Cmwlth. 622, 626–28, 638 A.2d 287, 289 (1994), *allo. denied*, 539 Pa. 660, 651 A.2d 546 (1994). The trial court properly rejected the motion of appellants to strike the expert testimony of Dr. Kyanka as speculative. As recounted above, Dr. Kyanka offered numerous factual observations to support his expert opinion that the ladder had been subjected to a twisting force applied to the rear legs at some time prior to Mrs. Spino's fall and that the split in no way caused or contributed to her fall. Although Dr. Kyanka conceded that he did not know precisely how the split in the rear leg of the ladder had been caused, he offered an opinion, based upon facts of record, and with a reasonable degree of certainty, that the ladder could not have fractured while Mrs. Spino was standing on it as alleged by appellants. Appellants, *not* appellee, bore the burden of proving causation in the instant case. Appellants were required to prove, to a reasonable degree of certainty, that the ladder caused Mrs. Spino's fall. Appellee, however, did not have any similar evidentiary burden.

[R]ecovery in a civil action depends at least initially on the sufficiency of the proof offered by the party who seeks to recover. The defendant ordinarily need not prove, with certainty or otherwise, that he or she is innocent of the alleged wrongdoing. Absent an affirmative defense or a counterclaim, the defendant's case is usually nothing more than an attempt to rebut or discredit the plaintiff's case. Evidence that rebuts or discredits is not necessarily proof. It simply vitiates the effect of opposing evidence. Expert opinion evidence ... certainly affords an effective means of rebutting contrary expert opinion evidence, even if the expert rebuttal would not qualify as proof.

*Neal by Neal v. Lu,* 365 Pa.Super. 464, 476, 530 A.2d 103, 109–10 (1987). *Accord: Dolan v. Carrier Corp., supra* at 618–19, 623 A.2d at 852; *Havasy v. Resnick,* 415 Pa.Super. 480, 496–98, 609 A.2d 1326, 1334 (1992); *Smick v. City of Philadelphia, supra* at 626–28, 638 A.2d at 289. As the expert opinion testimony of Dr. Kyanka was based upon facts in evidence, the trial court properly rejected the motion to exclude Dr. Kyanka's testimony.

III. *Cross–Examination of Expert Witness on Issue of Bias.*

Nor is there merit to the claim that the trial court committed reversible error, requiring the award of a new trial, when it permitted Tilley to cross-examine Dr. Smith, the expert retained by appellants, as to income earned as an expert witness in assignments unrelated to the instant case. This Court has repeatedly observed that " 'the scope and limits of cross-examination are within the trial court's discretion and the court's ruling thereon will not be reversed in the absence of a clear abuse of discretion or an error of law.' " *Rafter v. Raymark Indus. Inc.,* 429 Pa.Super. 360, 366, 632 A.2d 897, 900 (1993), *quoting Kemp v. Qualls,* 326 Pa.Super. 319, 324, 473 A.2d 1369, 1371 (1984). *Accord: Pascone v. Thomas Jefferson Univ.,* 357 Pa.Super. 524, 533–34, 516 A.2d 384, 389 (1986). A party is entitled to cross-examine an expert witness to explore the credibility of the witness and to inquire into any potential bias, interest or relationship which could

effect the testimony of the witness. *See, e.g.: Downey v. Weston,* 451 Pa. 259, 263–65, 301 A.2d 635, 639 (1973); *Zamsky v. Public Parking Authority of Pittsburgh,* 378 Pa. 38, 39–40, 105 A.2d 335, 336 (1954); *Smith v. Celotex Corporation,* 387 Pa.Super. 340, 348–52, 564 A.2d 209, 213–14 (1989); *Douglass v. Licciardi Construction Co., Inc.,* 386 Pa.Super. 292, 299–300, 562 A.2d 913, 917 (1989); *Mohn v. Hahnemann Medical College and Hospital of Philadelphia,* 357 Pa.Super. 173, 177–79, 515 A.2d 920, 923 (1986).

This Court, in *Smith v. Celotex, supra,* while finding that the broad cross-examination of an expert witness concerning "his prior testimony on behalf of other asbestos companies and the fees he earned therefrom," was "perhaps slightly beyond the proper scope," held that the appellant was not entitled to a new trial as the cross-examination had not gone beyond the limitation set forth by the Court in *Mohn v. Hahnemann Medical College and Hospital of Philadelphia, supra,* and *Smith v. Celotex, supra* at 348–53, 564 A.2d at 213–15. This Court in *Mohn, supra,* awarded a new trial as a result of the cross-examination of the defendant's expert where the trial court permitted inquiry into the amount of *all* fees received by the expert for services provided not only to patients, but to private and governmental agencies, and to law firms for the years 1979 through 1983. The Court, in *Mohn,* found that "the emptying of one's pockets and turning them inside out so that one's financial worth can be open to scrutiny," was irrelevant to the issue of the credibility and potential bias of the witness, and so prejudicial as to require the award of a new trial. *Mohn v. Hahnemann Medical College and Hospital of Philadelphia, supra* at 179–81, 515 A.2d at 924.

█ The cross-examination at issue in the instant case, while also beyond the proper scope of cross-examination on the issue of bias, was properly curtailed by the trial court upon the objection of counsel for appellants, who did not request cautionary instructions or make a motion for a mistrial. Dr. Smith, who had testified that he was the principal of a forensic consulting company, was asked the following questions on cross-examination:

Q. The business of forensic consulting, forensic consulting means consulting for lawyers and their clients, does it not, parties and their lawyers?

 \* \* \* \* \* \*

Q. Is that a pretty lucrative business?

 \* \* \* \* \* \*

Q. Let me put it this way. Back in 1982 you were earning $100,000 or more per year, weren't you, from this business?

In light of the fleeting nature of the inquiry, the fact that it was marginally relevant to the issue of bias, that the objection of appellants was sustained, and in the absence of a request for a cautionary instruction or a mistrial, the trial court properly denied the request for a new trial based upon this portion of the cross-examination of Dr. Smith.

IV. *Right of Appellants to Subpoena Expert Retained by Appellee.*

Appellants also argue that the trial court committed reversible error when it refused to allow appellants to subpoena Dr. Toland, a physician who had been retained as an expert by Tilley to examine Mrs. Spino, after appellee indicated that Dr. Toland would not be called as a witness at trial. The trial court did not prohibit appellants from *retaining* Dr. Toland but rather refused to allow the appellants to *compel* Dr. Toland to testify under subpoena, holding that "the plaintiff does not have the right to *compel* a defense expert to give an expert opinion." We agree. This Court, in *Jistarri v. Nappi,* 378 Pa.Super. 583, 549 A.2d 210 (1988), affirmed the decision of the trial court which had refused to allow the plaintiff to employ the videotaped deposition of a defendant physician so as to provide an expert opinion at trial "concerning the allegedly negligent conduct of other defendant[s]." *Jistarri v. Nappi, supra* at 599, 549 A.2d at 218. This Court found that "appellant was not free to require Dr. Codario to give expert testimony, against his will, against the other defendants. '[T]he private litigant has no more right to compel a citizen to give up the product of his brain, than he

has to compel the giving up of material things.'" *Jistarri v. Nappi, supra,* quoting *Pennsylvania Co. for Insurances, etc., Trustee v. Philadelphia,* 262 Pa. 439, 442, 105 A. 630 (1918). *Accord: Evans v. Otis Elev. Co.,* 403 Pa. 13, 27–29, 168 A.2d 573, 580 (1961). *Cf. Smith v. Barker,* 368 Pa.Super. 472, 475–79, 534 A.2d 533, 535–536 (1987), *allo. denied,* 520 Pa. 577, 549 A.2d 137 (1988); *Pascone v. Thomas Jefferson University,* 357 Pa.Super. 524, 516 A.2d 384 (1986). The trial court in the instant case did not *prohibit* Dr. Toland from testifying, if *he* so desired, for appellants. Rather, the court simply precluded appellants from *compelling* Dr. Toland to provide an expert opinion. This was not error and provides no basis for the award of a new trial. Nor, under these circumstances, was it error to refuse to include a missing witness instruction in its charge to the jury based upon the absence of Dr. Toland. *See: Downey v. Weston,* 451 Pa. 259, 265–67, 301 A.2d 635, 640 (1973); *O'Rourke v. Rao,* 411 Pa.Super. 609, 613–15, 602 A.2d 362, 364 (1992).

## V. *Evidentiary Rulings.*

The two remaining arguments presented by appellants in support of their request for a new trial, while meritless, have not been properly preserved for appellate review.

 Appellants contend that the trial court committed reversible error when, during the direct examination of Dr. Smith, it sustained an objection to the inquiry: "if anti-split device were placed on this type by the Tilley Ladder Company would that split you're looking at now, would that have occurred?" The objection was sustained but the basis for the objection was not made a matter of record nor does the record reflect that appellants sought to provide an offer of proof. While the docket reflects that post verdict motions were filed, neither the original record nor the reproduced record submitted to this Court include such motions. Nor did the trial judge address the issue in his opinion written in response to the post-verdict motions filed by appellants. The responsibility for providing a complete record for purpose of review on appeal is borne by the appellant. *See: Smith v. Smith,* 431

Pa.Super. 588, 590–91, 637 A.2d 622, 623 (1993), *allo. denied,* 539 Pa. 680, 652 A.2d 1325 (1994); *School Dist. of Aliquippa v. Maryland Casualty Co.,* 402 Pa.Super. 569, 574–75, 587 A.2d 765, 768 (1991); Pa.R.App.P. 1911(a). Appellee contends that the argument now made by appellants was never presented to the trial court, resulting in waiver. *See: Adamsky v. Picknick,* 412 Pa.Super. 544, 548–49, 603 A.2d 1069, 1071 (1992); *Connelly v. Roper Corp.,* 404 Pa.Super. 67, 69–73, 590 A.2d 11, 13–14 (1991); *TCI Constr. Corp. v. Gangitano,* 403 Pa.Super. 621, 625–27, 589 A.2d 1135, 1138 (1991); *School Dist. of Aliquippa v. Maryland Casualty, supra* at 574–75, 587 A.2d at 768. In any event, since our review of the available record establishes that the testimony of the expert was not unduly restricted, we summarily reject this claim of error.

 Appellants' final contention is that a new trial is required as a result of a reference, in closing arguments, to the "malpractice crisis." [1] The objection to the remark made by counsel for appellee in closing arguments was immediately sustained by the trial court and counsel for appellants did not request curative instructions or a mistrial. Thus, there is no basis upon which relief can now be granted to appellants by this Court. *See, e.g., Commonwealth v. Jones,* 501 Pa. 162, 165–67, 460 A.2d 739, 741 (1983); *Commonwealth v. McGeth,* 424 Pa.Super. 321, 325–28, 622 A.2d 940, 942–43 (1993). Moreover, the remark was not such as would have warranted the award of a mistrial even if one had been timely requested. *Dolan v. Carrier Corp., supra* at 620–22, 623 A.2d at 853; *Taylor v. Celotex Corp.,* 393 Pa.Super. 566, 587–88, 574 A.2d 1084, 1095 (1990).

Having rejected each of the arguments in support of the request for a new trial, we affirm the judgment entered upon the verdict of the jury.

Judgment affirmed.

1. Counsel was apparently beginning a new line of argument with the statement: "We talk about the malpractice crisis and doctors having to practice defensive medicine." When the objection was sustained, no further remarks in this vein were made by counsel.