**Gurevitz v. Piczon**

C.P. of Lackawanna County, no. 95-CV-1039.

*John R. Lenahan Jr.* and *Joseph P. Lenahan,* for plaintiff.

*Joseph Lach,* for defendant Piczon.

*Michael P. Perry,* for defendant Community Medical Center.

NEALON, *J.,* September 10, 1999—Plaintiff, Mark Gurevitz, has filed a motion in limine seeking to introduce evidence of prior malpractice lawsuits and alleged acts of neurosurgical negligence involving defendant,

Severino Piczon M.D., which Gurevitz maintains should have alerted defendant, Community Medical Center, to Dr. Piczon's purported incompetence to perform spinal surgery. CMC has filed a cross-motion in limine to prohibit any reference to such other claims or treatment. For the reasons set forth below, Gurevitz will be permitted to make reference to those prior acts of alleged negligence by Dr. Piczon at CMC which occurred under circumstances that were sufficiently similar to those at issue in this case.

## I. FACTUAL BACKGROUND

The instant medical negligence litigation is the last chapter in a trilogy of neurosurgical malpractice claims filed against Dr. Piczon based upon spinal surgeries performed by him at CMC. See *Mulligan v. Dr. Piczon and CMC,* 95-CV-1039 (Lacka. Co.); *Cornfield v. Dr. Piczon and CMC,* 95-CV-1284 (Lacka. Co.). In the present matter, Gurevitz contends that Dr. Piczon deviated from the standard of care by improperly performing an anterior cervical discectomy and fusion at C5-6 on August 24, 1993, when that surgery was not indicated by preoperative diagnostic testing and by thereafter negligently performing lamino-foraminotomies and osteophytectomies at C4-5 and C5-6 on November 18, 1993, utilizing a posterior, rather than an anterior, approach. (See plaintiff's motion in limine, ¶¶1-2.) Gurevitz asserts that Dr. Piczon is liable to him for injuries caused by his malpractice and that the CMC is independently negligent for permitting Dr. Piczon to perform spinal surgery even though he had previously demonstrated that he was not competent to do so. (*Id.,* ¶¶4-10.)

At the time that this action was originally commenced, it was consolidated with the malpractice claims being

advanced by Loretta Mulligan who was also named as a plaintiff in this proceeding. Mulligan averred that on April 6, 1993, she underwent a lumbar laminectomy with foraminotomies and decompression by Dr. Piczon at the CMC even though the results of her earlier myelogram and CT scan demonstrated that such surgery was not warranted. (See Mulligan complaint, ¶¶10-11.) Mulligan contends that her spinal surgery was improperly performed by Dr. Piczon and caused permanent damage to the nerves in her lower spine area. Mulligan further submits that Dr. Piczon negligently managed her condition post-operatively and required her to submit to a second surgical procedure on April 10, 1993, to evacuate an alleged epidural fluid collection. (*Id.,* ¶¶12-24.) Not unlike Gurevitz, Mulligan named Dr. Piczon and CMC as defendants and asserts substantially similar theories of liability against them.

The Cornfield matter concerns an anterior cervical discectomy and carpectomy with a fibular strut fusion that was performed by Dr. Piczon at the CMC on February 10, 1994, almost six months after Gurevitz's first surgery. (See plaintiff's complaint, ¶¶4-15 in *Cornfield v. Dr. Piczon and CMC,* no. 95-CV-1284 (Lacka. Co.).) Cornfield has advanced additional claims against Dr. Piczon and CMC with respect to a second surgical stabilization procedure that was performed on March 11, 1994. (*Id.,* ¶¶16-22.) In connection with those claims. Cornfield alleges that "the CMC hospital had prior knowledge of Dr. Piczon's professional problems since two of his prior patients, Loretta Mulligan and Mark Gurevitz, had both been subjected to multiple surgeries in 1993 at CMC hospital with disastrous consequences." (*Id.,* ¶¶9, 42.)

Although Gurevitz has not produced any expert reports from the *Cornfield* litigation, the exhibits attached

to his motion in limine reflect that Mulligan and Gurevitz retained the same expert witnesses in their respective cases. (See reports of Alain C.J. de Lotbiniere M.D., Paul K. Bronston M.D., Albert W. Auld M.D., and Robert A. Fink M.D., attached to plaintiff's motion as exhibits C, D, E, F, G, H, I, J and K.) Dr. Bronston authored a single report applicable to both the Mulligan and Gurevitz cases in which he cited the CMC's medical staff bylaws, hospital quality review plan and rules and regulations and opined that inasmuch as Dr. Piczon had failed his neurosurgical board certification examinations on four separate occasions, it was incumbent upon CMC "to see that Dr. Piczon was a competent and well-qualified physician" who was able "to perform the type of surgical procedures he was doing on both Mr. Gurevitz and Ms. Mulligan." (*Id.*, exhibit D, p. 4.) Dr. Bronston reasoned that "[t]he lack of proper credentialing of [Dr. Piczon] coupled with the various alleged negligence of his actions toward these two patients would contribute to the poor outcome to these patients." (*Id.*)

On July 9, 1999, Dr. Bronston issued a supplemental report in which he remarked:

"The lack of this process to monitor and trend this physician contributed to the poor outcome in Mr. Gurevitz's case. This occurs because the lack of oversight causes a failure to identify problems with Dr. Piczon's care and treatment of patients. In fact, previous expert opinions in the Loretta Mulligan case stated that there were serious and profound deviations from the standard of care by Dr. Piczon in her treatment. Based on those expert opinions, this should have triggered a peer review process in which hospital quality controls, *i.e.,* the quality assurance process, re-evaluated the general competency of Dr. Piczon and more specifically his ability to

perform surgical procedures. It is essential to evaluate and monitor poor patient outcomes and to date I have not seen any documented evidence that this ongoing monitoring and trending occurred, thereby breaching the standard of care of hospital quality assurance systems and CMC's own policies and procedures which are designed to protect patients. . . .

"Limiting, modifying, revoking or suspending clinical privileges, even a summary suspension of privileges, are designed to protect patients against physicians who pose a danger to patient care. . . . Community Medical Center's own medical staff bylaws state that corrective action proceedings are initiated when there is reliable information that a practitioner 'has acted in a manner detrimental to patient safety or the delivery of quality patient care.' If there is not any monitoring of a practitioner's care, then the reliable information cannot be generated so as to be acted upon. Likewise, if there is not any enforcement of hospital medical staff bylaws regarding corrective action, then unsafe practitioners continue to jeopardize patient care. . . .

"The failure of the hospital to operate a standard of care medical quality management program which consists of ongoing monitoring and trending of Dr. Piczon and hospital staff would be violation of the standard of care. As of the date of this report, CMC's medical staff bylaw and quality management policies are within the standard of care, but CMC still has not produced any documented evidence that the policies were carried out. It is not enough to have policies if they are not enforced and implemented. It is my expert opinion that a documented, thorough and enforceable quality assurance/ management program was not in place to insure that Dr. Piczon was qualified to perform those procedures on Mr.

Gurevitz and that the hospital staff was competent to position the patient correctly for surgery. Therefore, the hospital, in addition to Dr. Piczon himself, would also be directly responsible and contributed within a probable degree of medical certainty to the poor outcome in Mr. Gurevitz's care." (*Id.,* exhibit K, pp. 6-8.)

Dr. Fink likewise critiqued the quality assurance controls in effect at the CMC and stated:

"I have also been involved in the review of the case of Loretta Mulligan, which occurred several months before the instant case. In that case (which has not been adjudicated), Dr. Piczon significantly departed from the standard of care and caused injury to Ms. Mulligan at the same institution as in the instant case. Such a radical breach of the standard of care in the Mulligan case should have triggered an urgent peer review action on the part of the hospital's peer review committees, and prompt action by such committees could have resulted in the suspension or curtailment of Dr. Piczon's surgical privileges. This could have avoided the subsequent injuries to Mr. Gurevitz." (*Id.,* exhibit H, p. 1.)

Dr. de Lotbiniere reached a comparable conclusion and opined "it appears to be self-evident that the hospital had the responsibility of exercising some supervision over the practice of Dr. Piczon, given the fact that on no less than four separate occasions, this physician proved that he was incapable of passing the American Board of Neurological Surgery examination, the standard to which surgeons across the country are held." (*Id.,* exhibit J, p. 3.) (See also, report of Dr. Auld dated July 7, 1999, attached as exhibit I, concluding that the Mulligan surgical failures should have prompted the CMC's surgical review committee, risk management committee and quality assurance committee to intervene to review, restrict or revoke Dr. Piczon's privileges.)

Gurevitz seeks to introduce evidence of Dr. Piczon's spinal surgery involving Mulligan and Cornfield. Gurevitz also requests judicial approval to make reference to laminectomies and spinal procedures performed by Dr. Piczon at CMC on Steven Moran and Jean D'Ambrosio in 1989, 1991 and May 12, 1993. Gurevitz submits that information concerning those surgeries is relevant to his argument that CMC should not have credentialed or permitted Dr. Piczon to perform Gurevitz's surgeries on August 24, 1993 and November 18, 1993.[1]

CMC has filed a brief in opposition to Gurevitz's motion in limine and in support of CMC's motion to preclude the introduction of such evidence. CMC generically argues that any reference to other alleged instances of malpractice is irrelevant and would tend to confuse or mislead the jury in contravention of Pa.R.E. 403. While acknowledging the existence of Gurevitz's direct claim against CMC for allowing Dr. Piczon to perform spinal surgery, CMC submits that Gurevitz should nonetheless be prohibited from utilizing the evidence in question.

## II. DISCUSSION
### (A) *Motion in Limine Standard*

"A motion in limine is a procedure for obtaining a ruling on the admissibility of evidence prior to or during

---

1. Although Gurevitz has produced pleadings or expert opinions relative to the surgeries involving Mulligan and Cornfield, he has not provided any documentation or expert opinion suggesting that Dr. Piczon deviated from the standard of care in connection with the Moran and D'Ambrosio surgeries. The only reference to the circumstances surrounding those spinal procedures is contained in Gurevitz's brief in support of his motion in limine. While Gurevitz's brief alludes to unsuccessful outcomes for Moran and D'Ambrosio, Gurevitz's submissions do not establish that those failed surgeries were the product of Dr. Piczon's negligence.

trial, but before the evidence has been offered." *Delpopolo v. Nemetz,* 710 A.2d 92, 94 (Pa. Super. 1998). "Generally, a trial judge should admit all relevant evidence unless a specific rule bars its admission." *Birth Center v. St. Paul Companies Inc.,* 727 A.2d 1144, 1163 (Pa. Super. 1999); *Engle v. West Penn Power Co.,* 409 Pa. Super. 462, 481, 598 A.2d 290, 299 (1991), *alloc. denied,* 529 Pa. 669, 605 A.2d 334 (1992). Evidence is considered relevant if it tends to make the facts at issue more or less probable or intelligible. *Shiner v. Moriarty,* 706 A.2d 1228, 1235 (Pa. Super. 1998); *Valentine v. Acme Markets Inc.,* 455 Pa. Super. 256, 261, 687 A.2d 1157, 1160 (1997). Gurevitz posits that evidence of Dr. Piczon's alleged prior malpractice is highly probative in relation to his corporate liability claim against CMC.

## (B) *Corporate Liability*

The evolution of the role of hospitals in the delivery of health care services to the public has been accompanied by a concomitant change in the potential liability of hospitals. Hospitals were originally shielded from civil liability to their patients by virtue of the charitable immunity doctrine that was first adopted in Pennsylvania in *Fire Insurance Patrol v. Boyd,* 120 Pa. 624, 15 A. 553 (1888), and later extended to hospitals in recognition of their original benevolent function of treating indigent patients. See *Knecht v. St. Mary's Hospital,* 392 Pa. 75, 77-78, 140 A.2d 30, 31-32 (1958); *Gable v. Sisters of St. Francis,* 227 Pa. 254, 260-61, 75 A. 1087, 1089 (1910). As health care facilities underwent a gradual metamorphosis from charitable institutions to commercial entities, Pennsylvania subsequently abolished the doctrine of charitable immunity in *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A.2d 193 (1965). Shortly there-

after, the Supreme Court of Pennsylvania concluded that a hospital could be vicariously liable for the negligence of its own employees based upon general principles of agency. *Tonsic v. Wagner,* 458 Pa. 246, 253-54, 329 A.2d 497, 501 (1974) (recognizing respondeat superior as a grounds for hospital liability). See also, *Brannan v. Lankenau Hospital,* 490 Pa. 588, 599, 417 A.2d 196, 201 (1980) (a hospital's vicarious liability includes the hospital staff's responsibility to notify an independent contractor physician of a patient's deteriorating condition).

The Superior Court of Pennsylvania later applied the Restatement (Second) of Torts §429 to hospitals and recognized that hospitals could be held accountable for the negligence of independent contractor physicians based upon the theory of ostensible or apparent agency. Reasoning that "the changing role of the hospital in society creates a likelihood that patients will look to the institution rather than the individual physician for care," the court held that a hospital could be vicariously liable for the negligence of an independent contractor physician if the patient turns to the hospital, as opposed to a particular doctor, for care and the hospital "holds out" the physician as its employee. *Capan v. Divine Providence Hospital,* 287 Pa. Super. 364, 368-69, 430 A.2d 647, 649-50 (1980); *Simmons v. St. Clair Memorial Hospital,* 332 Pa. Super. 444, 452, 481 A.2d 870, 874 (1984). Such "[a] holding out occurs 'when the hospital acts or omits to act in some way which leads the patient to a reasonable belief [that] he is being treated by the hospital or one of its employees.' " *Capan, supra* at 370, 430 A.2d at 649.

Earlier this decade, Pennsylvania expanded the potential liability of hospitals even further by expressly adopting the theory of corporate liability which is predicated upon the systemic or institutional negligence of the hos-

pital itself rather than the acts of individual hospital employees. In *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), the Supreme Court acknowledged "a nondelegable duty which the hospital owes directly to a patient" that is not dependent upon the negligence of a third party. *Id.* at 339, 591 A.2d at 707; *Edwards v. Brandywine Hospital,* 438 Pa. Super. 673, 685-86, 652 A.2d 1382, 1388 (1995) (holding that if a hospital promulgates a substandard rule that its employees follow, the hospital may be corporately liable even though the employees who followed that protocol may not be at fault). Recognizing that "[t]he corporate hospital of today has assumed the role of a comprehensive health center with responsibility for arranging and coordinating the total health care of its patients," *Thompson, supra* at 338, 591 A.2d at 706 (footnote omitted), the court articulated four duties applicable to a hospital under the concept of corporate negligence: "(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment . . . ; (2) a duty to select and retain only competent physicians . . . ; (3) a duty to oversee all persons who practice medicine within its walls as to patient care . . . ; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for all patients . . . ." *Id.* at 339-40, 591 A.2d at 707 (citations omitted); *Moser v. Heistand,* 545 Pa. 554, 558, 681 A.2d 1322, 1324-25 (1996).

Consistent with traditional negligence principles in a corporate negligence case, "it is necessary to show that the hospital had actual or constructive knowledge of the defect or procedures which created the harm." *Thompson, supra* at 341, 591 A.2d at 708; *Welsh v. Bulger,* 548 Pa. 504, 513, 698 A.2d 581, 585 (1997). In addition, the plaintiff must establish that the hospital's negligence was

a substantial factor in bringing about the harm to the injured party. *Thompson, supra; Welsh, supra.* Moreover, "unless a hospital's [corporate] negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff." *Welsh, supra* at 514, 698 A.2d at 585; *Walls v. Hazleton State General Hospital,* 157 Pa. Commw. 170, 178, 629 A.2d 232, 235-36 (1993) (corporate liability cannot be established in the absence of expert testimony demonstrating a connection between the conduct and the resultant harm); *Stipp v. Kim,* 874 F. Supp. 663, 665-66 (E.D. Pa. 1995) (dismissing corporate negligence claim due to the plaintiff's failure to produce the requisite expert opinion regarding a breach of one of the four duties enunciated in *Thompson*).

Although the doctrine of corporate negligence has amplified the tort liability of hospitals, it is not entirely without circumscription. For example, *Thompson* does not provide a basis for extending strict liability principles to hospitals, *Cafazzo v. Central Medical Health Services Inc.,* 430 Pa. Super. 480, 484, 635 A.2d 151, 153 (1993), nor does it expose a hospital to corporate liability for failing to formulate certain policies relating to informed consent since mere negligence cannot satisfy the mental state requirement for a battery claim. *Kelly v. Methodist Hospital,* 444 Pa. Super. 427, 432-34, 664 A.2d 148, 150 (1995); *Davis v. Hoffman,* 972 F. Supp. 308, 313 (E.D. Pa. 1997). But see, *Corrigan v. Methodist Hospital,* 158 F.R.D. 70, 73 (E.D. Pa. 1994) ("Therefore, a hospital cannot be sued for corporate negligence for failure to seek informed consent under the traditional battery theory. A hospital can, however, be sued for negligently failing to oversee its doctors and failing to 'formulate,

adopt and enforce adequate rules and policies,' which may include policies governing obtaining informed consent."). Furthermore, while an HMO which participates in decisions affecting their subscribers' medical care may be found corporately liable, *Shannon v. McNulty,* 718 A.2d 828, 836 (Pa. Super. 1998), *Thompson* has been held inapplicable to state-owned medical facilities governed by the medical-professional liability exception to sovereign immunity, *Moser, supra,* doctors' offices or practices, *Milan v. American Vision Center,* 34 F. Supp.2d 279, 282 (E.D. Pa. 1998) (predicting "that the Pennsylvania Supreme Court will not extend the doctrine of corporate liability to cover optometrists' offices"), and treatment provided by a hospital's staff physician at his private office. *Woolfolk v. Duncan,* 872 F. Supp. 1381, 1394 n.25 (E.D. Pa. 1995).

Pennsylvania courts have had occasion to refine the parameters of the four duties established in *Thompson.* "[I]f a hospital fails to keep an incompetent doctor from practicing within its walls, and a patient suffers harm as a result, the patient may have a cause of action in corporate liability against the hospital." *Moser, supra* at 560-61, 681 A.2d at 1326. Similarly, if a hospital grants surgical privileges to a physician "knowing that he was not competent to perform surgery," a patient who is subsequently harmed as a result of surgery performed by that physician may advance a "claim of corporate negligence against the hospital for failure to retain only competent physicians and for failure to formulate and enforce policies to ensure quality care." *Welsh, supra* at 515-16, 698 A.2d at 586. A hospital may also be corporately liable if it furnishes staff privileges to physicians "with knowledge of, or failure to learn of, their malpractice history." *Corrigan v. Methodist Hospital,* 869 F. Supp. 1208, 1211

(E.D. Pa. 1994). Accord, *Johnson v. Misericordia Community Hospital,* 99 Wis.2d 708, 301 N.W.2d 156 (1981) (hospital could be corporately liable for providing orthopedic surgery credentials to a physician who, inter alia, was neither board-certified nor board-eligible in orthopedic surgery and had seven malpractice suits pending again him). Compare, *Domineck v. Mercy Hospital of Pittsburgh,* 449 Pa. Super. 313, 318, 673 A.2d 959, 962 (1996) (in the absence of any evidence that closer monitoring of a staff physician's insurance coverage would have alerted the hospital that the physician was incompetent, a hospital cannot be corporately negligent for failing to ensure that its staff physicians maintained malpractice insurance).

Federal legislation, state regulations and health care industry standards likewise require hospitals to conduct continuous reviews of the quality of the health care services being provided within their institutions. See 42 U.S.C. §1320c-3(a)(1)(B) (peer review organizations must review professional activities of physicians at hospitals receiving Medicare reimbursements to determine if they satisfy professionally recognized standards of health care); 28 Pa. Code §§103.4(1), (9) and (12) (directing hospitals to create a quality control mechanism which includes a risk management component and to require the medical staff to evaluate the professional competence of applicants for staff privileges and establish controls that are designed to ensure high standards of ethical professional practices); 28 Pa. Code §103.34 (obligating the hospital governing body to develop personnel policies and procedures "which adequately support sound patient care"). The Joint Commission on Accreditation of Health Care Organizations compels hospitals who seek JCAHO accreditation to establish an "ongoing

quality assurance program designed to objectively and systematically monitor and evaluate the quality and appropriateness of patient care, pursue opportunities to improve patient care, and resolve identified problems." See "Tort Law—Expansion of Hospital Liability Under the Doctrine of 'Corporate Negligence' in *Thompson v. Nason Hospital,*" 65 Temp. L. Rev. 787, 791 n.40 (summer 1992) (quoting *Accreditation Manual for Hospitals,* §QA.1 at 215).

The Health Care Quality Improvement Act of 1986, 42 U.S.C. §11101 et seq., further requires a hospital to access the National Practitioner Data Bank prior to granting or renewing clinical privileges to a physician in order to determine whether the applicant has been subject to any disciplinary action by a state medical board, monetary payments in settlement or satisfaction of any medical malpractice claims, adverse peer reviews by professional societies, or unfavorable action by a health care entity in connection with a request for privileges. 42 U.S.C. §1135(a). In fact, if a hospital does not request the foregoing information from the National Practitioner Data Bank, the hospital is presumed in any medical malpractice proceeding to have knowledge of any information reported to the data bank about the physician or health care practitioner in question. 42 U.S.C. §11135(b). Thus, based upon the foregoing federal and state legislation and case law, CMC had a duty to grant privileges only to those physicians determined to be competent to provide the medical services authorized by the privileges and to implement quality control procedures to ensure proper patient care.

### (C) *Prior Acts of Negligence*

Gurevitz maintains that evidence regarding the Mulligan, Cornfield, Moran and D'Ambrosio spinal surger-

ies is relevant to his contention that CMC breached its *Thompson* duties to select and retain only competent physicians, to oversee all persons who practice medicine within its walls, and to formulate, adopt and enforce adequate policies to ensure quality patient care. In tort litigation, evidence of prior incidents or injuries "involving the same instrumentality is generally relevant to show that a defect or dangerous condition existed or that the defendant had knowledge of the defect." *Valentine, supra* at 266, 687 A.2d at 1162; *Vernon v. Stash,* 367 Pa. Super. 36, 47, 532 A.2d 441, 446 (1987). Such evidence is admissible only if the prior incident "is sufficiently similar to the incident involving the plaintiff which occurred under sufficiently similar circumstances." *Valentine, supra* at 266, 687 A.2d at 1162; *Lynch v. McStome and Lincoln Plaza Associates,* 378 Pa. Super. 430, 436, 548 A.2d 1276, 1279 (1988). Moreover, evidence of other instances of negligence "that occur subsequent to that upon which the litigation is brought is not admissible to show knowledge of a condition prior to an [incident]." *Hoffmaster v. County of Allegheny,* 121 Pa. Commw. 266, 276-77, 550 A.2d 1023, 1028 (1988), *alloc. denied,* 522 Pa. 606, 562 A.2d 828 (1989). In that regard, the party seeking to introduce evidence of prior negligence bears the burden of establishing the requisite similarity as a prerequisite to its admission. *Valentine, supra* at 266, 687 A.2d at 1162-63; *Spino v. John S. Tilley Ladder Co.,* 448 Pa. Super. 327, 346, 671 A.2d 726, 735 (1996), *aff'd,* 548 Pa. 286, 696 A.2d 1169 (1997).

The fact that a physician did not properly perform a particular surgical procedure does not necessarily mean that [s]he is not qualified to provide any medical services at a health care facility. For example, although an OB-GYN may demonstrate obstetrical deficiencies in

managing a patient's labor and delivery, that physician may still possess the requisite acumen to perform a gynecological procedure. In that instance, a hospital may arguably satisfy its *Thompson* obligations by restricting the OB-GYN's privileges to gynecological care. For that reason, any evidence of prior alleged acts of malpractice should bear sufficient similarity to the case sub judice in order to be admitted into evidence.

Instantly, Gurevitz's submissions reflect that Mulligan's injuries occurred under sufficiently similar circumstances and are, therefore, admissible to demonstrate actual or constructive notice to CMC of Dr. Piczon's ability to perform spinal surgery. Both Mulligan and Gurevitz assert that Dr. Piczon subjected them to unwarranted spinal surgery that he performed in a negligent manner. Additionally, the Mulligan operative procedures occurred prior to the dates of Gurevitz's surgeries and Gurevitz has produced several expert reports indicating that Dr. Piczon deviated from the standard of care with regard to the Mulligan surgery. Moreover, Dr. Bronston, Dr. Fink, Dr. de Lotbiniere and Dr. Auld all refer to the Mulligan incidents in support of their conclusions that CMC did not comply with the institutional standard of care in the implementation and enforcement of its quality assurance procedures. Hence, Gurevitz will be permitted to introduce evidence of the Mulligan operative procedures in connection with his corporate liability claim against CMC. See *e.g., Costa v. Roxborough Memorial Hospital,* 708 A.2d 490, 496-97 (Pa. Super. 1998) (hospital may be negligent for failing to properly supervise an employee if the hospital had reason to know of the employee's propensity for improper conduct); *Mandralla v. Weaver Corporation,* 703 A.2d 480, 484 (Pa. Super. 1997) (evidence of similar past injuries involving

a product was admissible to establish defendant's knowledge that the product was defective prior to the date of the plaintiff's injury).

In contrast, any reference to Cornfield's surgeries is not relevant to Gurevitz's corporate liability claim since Cornfield's operative procedures postdate Gurevitz's surgeries. How could CMC possibly have been expected to have had actual or constructive notice of a potential problem involving Dr. Piczon's surgical abilities at the time of Gurevitz's procedures on August 24, 1993 and November 18, 1993, based upon Cornfield's spinal procedures that were later performed on February 10, 1994 and March 11, 1994? To the contrary, Cornfield specifically averred in his complaint that CMC had knowledge of Piczon's alleged incompetence by virtue of "the disastrous consequences" from Gurevitz's surgeries in 1993. (See Cornfield's complaint, ¶¶9, 42.) Thus, inasmuch as Cornfield's operative procedures postdated Gurevitz's surgeries, Gurevitz will be precluded from making any reference to the Cornfield matter during the trial of this case.

Last, with respect to the Moran and D'Ambrosio incidents, Gurevitz has not submitted any expert reports or medical documentation suggesting that the unsuccessful results of those spinal surgeries were caused by the negligence of Dr. Piczon. It is well settled that a physician is not liable merely because the treatment in question ended unfavorably, nor does a presumption or inference of negligence arise from an unfortunate result. *Collins v. Hand,* 431 Pa. 378, 383, 246 A.2d 398, 401 (1968); *Grubb v. Albert Einstein Medical Center,* 255 Pa. Super. 381, 391, 387 A.2d 480, 485 (1978). Rather, the plaintiff must demonstrate that the physician's negligence was a substantial factor in bringing about harm to

the patient. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 64, 584 A.2d 888, 892 (1990). The Moran and D'Ambrosio surgeries may have yielded unsuccessful results notwithstanding Dr. Piczon's compliance with the applicable standard of care, and to date, Gurevitz has not submitted any expert opinion to the contrary. Accordingly, until such time as Gurevitz produces the appropriate expert documentation, he will be prohibited from introducing evidence relative to the Moran and D'Ambrosio surgeries. An order will be entered denying Gurevitz's motion in limine in that regard without prejudice to his right to request reconsideration of this ruling following the submission of expert opinion(s) substantiating Dr. Piczon's negligence in connection with Moran and D'Ambrosio.

## ORDER

And now, September 10, 1999, upon consideration of the motions in limine filed by plaintiff, Mark Gurevitz, and defendant, Community Medical Center, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

"(1) The motions in limine are granted in part and denied in part;

"(2) Plaintiff may introduce evidence concerning the spinal surgeries performed by defendant, Severino Piczon M.D., at defendant, Community Medical Center, involving Loretta Mulligan;

"(3) Plaintiff is precluded from making any reference to the spinal surgeries performed by defendant, Severino Piczon M.D., at defendant, Community Medical Center, involving Michael Cornfield since those surgeries occurred after the dates of plaintiff, Mark Gurevitz's, surgical procedures; and

"(4) Until such time as the plaintiff, Mark Gurevitz, produces an expert report or opinion indicating that de-

fendant, Severino Piczon M.D., deviated from the applicable standard of care in connection with the spinal surgeries he performed upon Steven Moran and Jean D'Ambrosio at defendant, Community Medical Center, plaintiff will be precluded from mentioning those surgeries at the time of trial."